UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL NO. MJ-2004-M-221-JLA

UNITED STATES

v.

ANTHONY BUCCI

### ORDER ON DETENTION

June 30, 2004

ALEXANDER, M.J.

The defendant, ANTHONY BUCCI ("Mr. Bucci"), appeared before this Court on May 25, 2004 and May 28, 2004, for a hearing on detention and probable cause pursuant to a complaint charging him with violation of 21 U.S.C. § 846 (unlawfully, knowingly and intentionally conspiring to possess with intent to distribute over 500 grams of cocaine, a schedule II controlled substance).[1]

At that hearing, the government was represented by Assistant United States Attorney John J. Farley. Mr. Bucci was represented by Attorney Robert D. Lewin. The government moved for detention pursuant to 18 U.S.C. §§ 3142 (f)(1)(C)(the offense carries a potential of ten or more years imprisonment pursuant to the Controlled Substances Act), (f)(2)(A)(serious risk of flight), and (f)(2)(B)(serious likelihood that the

---

[1] Following the hearing on May 28, 2004, this Court found that there was probable cause to believe that Mr. Bucci committed the offense with which he was charged. An order on probable cause was entered that day.

defendant will obstruct justice, or threaten, injure, or intimidate a prospective witness, or attempt to do so).  In support of its motion to detain and to establish probable cause, the government presented the credible testimony of Trooper Kevin O'Neil ("Trooper O'Neil"), a twelve year veteran of the Massachusetts State Police.  Trooper O'Neil, who was involved in the investigation of the defendant, testified that he has worked with the Drug Enforcement Administration ("DEA") on a regular basis and participated in narcotics training and investigations during his tenure with the Massachusetts State Police. Trooper O'Neil's credible testimony (which included information contained in the affidavit of Special Agent Mark Tully with the DEA that was previously offered to the Court in support of a criminal complaint in this matter) includes the assertions set forth below.

In December of 2003, Trooper O'Neil was involved in the investigation of Carlos Ruiz ("Mr. Ruiz").  As authorized by court order, the DEA subsequently intercepted wire communications over a cellular telephone used by Mr. Ruiz.  DEA agents intercepted a conversation between Mr. Ruiz and John Minotti ("Mr. Minotti") from which law enforcement agents inferred that a drug transaction involving three kilograms of cocaine would take place on the morning of December 24, 2003 at Mr. Minotti's home in Stoneham, MA.  Accordingly, law enforcement personnel established surveillance of Mr. Minotti's home early that morning.

During the course of surveillance on the morning of December 24th, authorities observed a black Mercedes Benz registered under Mr. Bucci's name parked in the

driveway of Mr. Minotti's residence. After the black Mercedes had left the premises, a red Buick Park Avenue, driven by Mr. Ruiz, arrived at Mr. Minotti's residence. Mr. Ruiz exited the vehicle carrying a black plastic bag and entered the garage of Mr. Minotti. Moments later both Mr. Minotti and Mr. Ruiz emerged from the garage area and returned to Mr. Ruiz's vehicle. They entered Mr. Ruiz's vehicle and drove off only to return to Mr. Minotti's residence forthwith. Mr. Minotti was observed to leave the vehicle, reenter the garage and return to the vehicle. The red Buick Park Avenue, carrying both Mr. Ruiz and Mr. Minotti, then drove off.

    The vehicle was followed to the Malden Medical Center where DEA agents, who were purportedly present at the medical center due to on-going surveillance, observed Mr. Ruiz park his vehicle next to Mr. Bucci's black Mercedes in the rear lot of the medical center. Mr. Bucci was observed to be in the area. Subsequently, a tan Honda Accord pulled up to the other vehicles and parked directly behind the Buick Park Avenue. A white male, later identified as David Jordan ("Mr. Jordan"), a detecteive employed by the Malden Police, exited the Honda and approached Mr. Ruiz. Following a brief conversation, both Mr. Ruiz and Mr. Jordan drove their respective vehicles out of the parking lot. Mr. Bucci was then seen walking away from the vehicles and entering the medical center. Shortly thereafter, Mr. Jordan reentered the medical center parking lot, returned to the rear lot and finally parked in front of the medical center. Mr. Bucci then emerged from the entrance of the medical center and approached Mr. Jordan, who was still occupying the tan Honda Accord. After a brief discussion, Mr. Jordan drove off and

Mr. Bucci returned to his black Mercedes only to drive off thereafter.

Some time later on December 24, 2003, law enforcement agents intercepted another telephone call from Mr. Ruiz. From the telephone call, agents deducted that Mr. Ruiz had just been robbed of three kilograms of cocaine and that he (Mr. Ruiz) believed he had been set up by the individuals involved. Mr. Ruiz remarked that his car at the time of the transaction was blocked in by a police officer, and that "Jon" (Mr. Minotti) had fled the scene with the three kilograms of cocaine. Mr. Ruiz indicated during the telephone conversation that although Mr. Minotti claimed he left the cocaine in the woods near the medical center, the cocaine had not been recovered.

Agents intercepted one final call on December 24, 2003 between Mr. Ruiz and "Gino," whom law enforcement personnel involved in the investigation believe to be Mr. Bucci. During the conversation, Mr. Ruiz demanded Mr. Bucci return the cocaine, and furthermore suggested that the transaction at the medical center was a set up because the police officer (Mr. Jordan) did not attempt to follow Mr. Minotti (who was supposedly running away with the contraband).

Following Trooper O'Neil's testimony and vigorous cross-examination by the defense,[2] the Court heard arguments on detention. The defendant's counsel advocates that Mr. Bucci be released, and furthermore proffers that Mr. Bucci be placed on electronic monitoring, confined to his home, and directed to undergo drug treatment

---

[2] Trooper O'Neil was cross-examined by all Counsel representing the co-defendants in this case.

rehabilitation.  In addition, defendant's counsel offers Mr. Bucci's mother's condominium as a surety.   The Court considers these suggestions more fully within the context of the detention analysis.

Pursuant to the Bail Reform Act of 1984, this Court shall detain a criminal defendant pending trial upon a determination that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community. . . ." 18 U.S.C. § 3142 (e); United States v. Montalvo-Murillo, 495 U.S. 711, 716-17 (1990).  "With regard to risk of flight as a basis for detention, the Government must prove by a preponderance of the evidence that no combination of conditions will reasonably assure the defendant's appearance at future court proceedings." United States v. DiGiacomo, 746 F. Supp. 1176, 1180-81 (D. Mass. 1990).  The burden of persuasion remains with the Government on the question of  flight risk.  *See* DiGiacomo, 746 F. Supp. at 1181, *citing* United States v. Jessup, 757 F. 2d 378, 381-82 (1st Cir. 1985).

The issue of whether the defendant poses as a danger to the community has a different requirement.  The Government must prove by clear and convincing evidence that no combination of conditions will reasonably assure the safety of any other person and the community.  United States v. Chimurenga, 760 F.2d 400 (2d Cir. 1985).  The meaning of clear and convincing evidence does not imply that the judge be "plumb sure" that there is no set of conditions that will protect the public, but the judge should be "pretty sure." United States v. Gray, 651 F. Supp. 432 (W.D. Ark. 1987), *aff'd,* 855 F.2d

5

858 (8th Cir.), *cert. denied*, 488 U.S. 866 (1988).

However, in cases, such as the one at bar, involving violations of the Controlled Substances Act, 21 U.S.C. § 801 *et seq.*, for which the defendant may be imprisoned for 10 or more years, there is a rebuttable presumption that there is "no condition or set of conditions [that] will reasonably assure the appearance of the person and the safety of any other person and the community." 18 U.S.C. § 3142(e).  This rebuttable presumption operates to shift the burden of production, but not the burden of persuasion, to the defendant.  *See* Jessup, 757 F.2d at 381.  The rebuttable presumption reflects Congress's belief that narcotics traffickers have the resources and contacts to flee to other countries, and that they pose particular risks of recidivism if released pending trial.  United States v. Arroyo-Reyes, 32 F.3d 561, 1994 WL 440654, *3 (1st Cir. 1994)(Table)(per curiam), *citing* United States v. Palmer-Contreras, 835 F.2d 15, 17 (1st Cir 1987) and United States v. Williams, 753 F.2d 329, 335 (4th Cir. 1985).  *See also* United States v. Portes, 786 F.2d 758, 765 (7th Cir. 1985).  Nevertheless, because of the interference of pre-trial detention with the "importan[t] and fundamental . . . right" of liberty, United States v. Salerno, 481 U.S. 739, 750 (1987), this Court will not make such a finding lightly.   The Court's independent analysis regarding detention is governed by the rubric set forth in 18 U.S.C. § 3142(g).

First, the Court looks to the nature and circumstances of the offense charged against the defendant.  The amounts of cocaine involved in this conspiracy, at least as far as the government is aware, are large.  A controlled substance such as cocaine maintains a

destructive capacity and the amount at issue in this case is clearly a cause for concern. Furthermore, the Court takes seriously any conspiracy to distribute any drug, particularly where there are also concerns about the defendant's purported propensity for violence (discussed below), and where the conspiracy involves other individuals with ties to law enforcement. The Court finds that both the nature of the offense and its circumstances are serious.

Second, the Court looks to the weight of the evidence against the defendant. Following the hearing on May 28, 2004, this Court found that there was probable cause to believe that Mr. Bucci committed the offense with which he was charged. The evidence against the defendant is not insignificant given the credible testimony of Trooper O'Neil, the surveillance undertaken, and statements made by a co-conspirator.

The Court's third inquiry relates to the individual defendant. Mr. Bucci is forty-one years of age and resides in North Reading, MA. He is currently married and has one son from this union; in addition, Mr. Bucci has three other children from a previous marriage. At the hearing, the defendant's mother testified on behalf of her son. She suggested in her testimony that following the deaths of his step-father and sister, Mr. Bucci developed a serious chemical dependency on such drugs as cocaine and oxycontin, and has used those drugs regularly since the deaths. Indeed, following his arrest, law enforcement personnel impounded Mr. Bucci's black Mercedes Benz and confiscated oxycontin and approximately 100 grams of cocaine. Moreover, in the week leading to his arrests, Mr. Bucci was heavily using various drugs while moving from hotel to hotel.

In addition to Mr. Bucci's penchant for drug use, evidence presented to the court by the government suggests that Mr. Bucci is also violent. By one recent example, in a phone conversation intercepted between Mr. Bucci and Mr. Minotti, Mr. Bucci boasts of assaulting a "rat" with an iron tire knocker in Las Vegas, NV.[3] More critically, Mr. Bucci has an extensive criminal record including various violent crimes and other controlled substance offenses culminating with a term of federal incarceration.

In considering the above factors, the Court finds that they strongly portend against release. The government has presented evidence that (in addition to the legal presumption of § 3142 (f)(1)(C)) implicates flight. Upon his arrest, law enforcement personnel confiscated over $6,000 in cash from Mr. Bucci's vehicle. A co-defendant in this case now cooperating with the investigation indicates that Mr. Bucci not only traffics in narcotics, but also has two law enforcement agents "under his control." Furthermore, conspiracies of the type implicated in this case have been found to provide the means through which the defendant might flee. Arroyo-Reyes, *supra*; Palmer-Contreras, *supra*.

Moreover, given Mr. Bucci's alleged use of extreme force (assaulting an individual whom he believed to be an informant) and his prior criminal record (which includes a conviction for assault and battery in 1991), there is real risk of danger to the community if Mr. Bucci were released. Aside from Mr. Bucci's own conduct, conspiracies like the one

---

[3] During the conversation with Mr. Minotti, Mr. Bucci commented that he had assaulted someone, injuring them severely, for cooperating with authorities. The court acknowledges defense counsel's supposition that Mr. Bucci's remarks were mere "puffery." Nevertheless, the defendant's comments communicate a proclivity to act violently at the very least, if not an affirmation of a violent act already committed.

at bar may present a continuing danger to the community if the defendant is released because of the likelihood that an illicit narcotics enterprise will continue to operate pending trial.  Arroyo-Reyes, *supra*; Palmer-Contreras, *supra*.

Against this backdrop, including the presumption of 18 U.S.C. § 3142(e-f), the Court concludes by a preponderance of the evidence that ANTHONY BUCCI poses a serious risk of flight and by clear and convincing evidence that he poses a danger to the community that cannot be vitiated by any condition or combination of conditions of release and ORDERS him DETAINED pending trial.  Further, pursuant to 18 U.S.C. § 3142 (i) it is ORDERED that:

1. The Defendant be, and hereby is, committed to the Custody of the Attorney General for confinement in a corrections facility, separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal;

2. The Defendant be afforded reasonable opportunity for private consultation with his counselors; and

3. On Order of a court of the United States or on request of an attorney for the government, the person in charge of the corrections facility in which the Defendant is confined shall deliver the Defendant to an authorized Deputy United States Marshal for the purpose of any appearance in connection with a court proceeding.

Review of this Order may be obtained by the Defendant's filing of a motion for revocation or amendment of the Order pursuant to 18 U.S.C. § 3145 (b).

SO ORDERED.

/S/ Joyce London Alexander
United States Magistrate Judge