UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) ) | |
| | ) | CRIMINAL ACTION NO. |
| VS. | ) | No. 04CR10194-RCL |
| | ) | |
| ANTHONY BUCCI, | ) | |
| Defendant. | ) | |

## MOTION FOR RECONSIDERATION OF DETENTION

Now comes the Defendant, Anthony Bucci, in the above numbered indictment, and moves that this Honorable Court reconsider its decision to detain Mr. Bucci in this matter. This Court, in its order dated June 30, 2004, determined that Mr. Bucci should be detained in this matter as the Court found that he was both a flight risk and a danger to the community. This conclusion is not supported by the record and as will be discussed shortly should be reversed. In particular, Mr. Bucci should be released as the following conditions will ensure his presence in court and that he is not a danger to the community. It is requested that Mr. Bucci be released forthwith to a bracelet (978 – 664 – 0532) to his home with his wife and young child pending completion of any necessary paperwork.

In particular, Mr. Bucci should be released to live with his wife and young child pursuant to the following conditions:

1.   Electronic monitoring;

2.   Mr. Bucci's mother will put up her condominium for surety (equity estimated in excess of $300,000; the condominium is her home);

3.   Report to pre-trial services once a week and telephone twice a week;

4.   Undergo drug treatment and rehabilitation as determined and worked out with pre-trial services, as well as random drug testing.

-2-

The above conditions will accomplish the desired objective. It is wrong for Mr. Bucci to be the only one detained when the evidence against him is miniscule at best.

As this Court is aware, the weight of the evidence against the accused is a factor to be considered under 18 USC 3142(g) (2). In this case, the Court found that the evidence against the defendant is not insignificant given the credible testimony of Trooper O'Neil, the surveillance undertaken, and statements made by a co-defendant. However, a careful review of the so-called alleged evidence does not support this conclusion.

The government has produced over six hundred pages of discovery in this case. As can best be determined, this investigation started with a wire tap request that was allowed by Judge Tauro on July 31, 2003. At that time the targets were the Secaida Organization and Jose Rosales, among others (page 81)[1]. Further orders were issued and Carlos Ruiz became a target (page 82). Although wire taps were continually authorized into January, 2004, there is no indication that Anthony Bucci had anything to do with these people or this organization.

In fact, it appears that the first time this alleged three-kilo deal of December 24, 2003 is mentioned is in a conversation between Minotti and Ruiz. This conversation is referred to on page 4 of the affidavit in support of the criminal complaint.

Subsequently, out of thin air, Mr. Tully concluded that a reference to "that guy" is to Anthony Bucci. The reference to Anthony Bucci as "that guy" has no corroboration and is on the same footing as saying that Anthony Bucci goes by the name of "Gino." Not only is that untrue, but the name "Gino" is actually the one used by Salvatore Mele (see

---

[1] Page numbers refer to numbers placed by the government in the discovery.

-3-

page 301).[2] Further, if the government did any investigation in this case, they would find that Anthony Bucci has never gone by the name of "Gino," while Salvatore Mele, a close acquaintance of Jon Minotti, has used this name most of his adult life.

This situation, which involves a number of drug deals, apparently got its start as a result of arrests in New Hampshire and the cooperation of a number of those arrested with the government (see page 522 – 523). As will be discussed further, many of the individuals involved, excluding Bucci, are involved in other deals (Ruiz in Mexico in November, 2003, involving the twenty six (26) kilos (page 522), and then Ruiz, Minotti and Richard (page 51)).

A review of the affidavit filed by Jean Druin in support of a wire tap that was authorized in December 15, 2003, discusses the securing of the twenty six kilos on November 15, 2003, and more kilos to arrive in December.

The situation changes when it becomes clear that Ruiz is involved with a Richard from California who knows and deals with Minotti. The first conversation[3] between Ruiz and Richard appear to happen on December 19, 2003 at 7:13 pm. As stated on page 51:

> On December 19, 2003, at approximately 7:13 p.m., RUIZ made an outgoing call over the RUIZ CELLPHONE to (818)581-8800, and spoke to RICHARD. During that conversation, RICHARD said, "I have a thing of the white, but on the green, I got like fuckin' seventy-five. . .fronted." RUIZ asked, "Why didn't you tell me that you were going to do that?" RICHARD replied, "Why didn't I tell you I was going to do what, get green instead?" RUIZ replied, "Yeah." RICHARD said, "The other one, you'll get more money out of it."

---

[2] On page 330, Trooper O'Neill stated, "During an intercepted conversation at approximately 4:43 P.M. on March 26, 2004, Fernando told Minotti to give $5,500.00 to 'Gino' (whom I believe to be Mele).

[3] Whether this is the first conversation or not cannot be conclusively stated as this is based on discovery provided by the government.

-4-

RICHARD said, "I had him send his driver down there." RICHARD said, "This guy. . . he gave me one key and then he's gonna front me a bunch of fuckin' green." RUIZ said, "You should have told me first, what was going on. . .I feel like you gotta do this shit behind my back."

On December 19, 2003 at 8:51 p.m. Minotti calls Ruiz and as stated on page 52:

Later that same night, at approximately 8:51 p.m., RUIZ received an incoming call over the RUIZ CELLPHONE from (781)244-3530, and spoke to MINOTTI. During that conversation, MINOTTI said, "I just talk to him. He said you thought we were doing something behind your back." RUIZ replied, "Yo, I send that money for something else." RUIZ continued, "I didn't send that money for that shit." RUIZ said, "I was expecting something else." MINOTTI said, "If we get caught with this dude, it's nothing, it's a slap on the wrist" (referring, I believe, to the decreased risk associated with trafficking in marijuana as opposed to cocaine).

The above also raises that Ruiz paid for the marijuana and that that is the money that Minotti subsequently owed to Ruiz, not money for the alleged three (3) kilos.

On December 20, 2003, Minotti calls Ruiz and discusses the obtaining cocaine for an alleged deal that was supposed to happen on December 24, 2003:

On December 20, 2003, at approximately 5:22 p.m., RUIZ received an incoming call over the RUIZ CELLPHONE from (617)908-0299, and spoke to MINOTTI. During that conversation, MINOTTI asked, "There's nothing around?" RUIZ said "Yeah, I gotta. . .I have somebody else." MINOTTI asked, "Is it good?" RUIZ replied, "Its pretty good." MINOTTI asked, "Can you do the three for that guy?" MINOTTI continued, "He'll take the three if you can get 'em." MINOTTI said, He's got cash, this guy's got a ton of money." RUIZ replied, "They're at twenty-eight right now." RUIZ said, "That's good shit." (See page 53.)

It should be noted that there is no reference to Anthony Bucci, only a reference to "that guy," and "that guy" appears to be a reference to Detective Jordan. Detective Jordan

-5-

and Minotti have had a relationship for a number of years involving a variety of money-making endeavors.[4]

On December 22, 2003, at approximately 12:15 p.m. there is a conversation between Ruiz and Minotti involving the alleged cocaine deal:

> On December 22, 2003, at approximately 12:15 p.m., RUIZ received an incoming call over the RUIZ CELLPHONE from TARGET TELEPHONE 1, and spoke to MINOTTI. During that conversation, RUIZ said, "He has plenty the kid" (a reference, I believe, to ROSALES). RUIZ continued, "He got something about, five left" (a reference, I believe, to five kilograms of cocaine). MINOTTI asked, "Well how much, did you talk to him abut if the kid buys three how much" (a reference, I believe, to MINOTTI's customer who wants three kilograms of cocaine)? RUIZ replied, "Yeah, he says he'll put them down for twenty-seven" (a reference, I believe, to $27,000 per kilogram. As discussed above, that is a figure consistent with the wholesale price of a kilogram of cocaine). MINOTTI asked, "Is it good though?" RUIZ replied, "It's good. . .trust me." RUIZ said, "This is better than the other shit I gave you." MINOTTI asked, "Can we do it today if he is ready or does it have to be tomorrow?" RUIZ replied, "Yeah." MINOTTI said, "I'll call you in a while." See page 129.

It is interesting to note, that this conversation was not in the affidavit of Mark Tully in support of the criminal complaint. The price in this conversation is twenty-seven thousand dollars ($27,000.00), not twenty-eight thousand dollars ($28,000.00)  per kilo. The cocaine would therefore cost eighty-one thousand dollars ($81,000.00), not eighty-four dollars ($84,000.00).

Even while this cocaine deal is being discussed between Minotti and Ruiz, another drug deal is being done between Ruiz, Minotti and Richard. As stated on pages 52 and 53:

---

[4] See attached pages 331-334 from the affidavit of Trooper O'Neil.

-6-

On December 22, 2003, at approximately 3:06 p.m., RUIZ received an incoming call over the RUIZ CELLPHONE from (818)581-8800, and spoke to RICHARD. During that conversation, RICHARD said, "Keith. . .he has already bee gone since. . .Saturday" (referring to the "driver"). RUIZ asked, "What did he send with him?" RICHARD replied, "The white girl" (referring to the kilogram of cocaine). RUIZ asked, "What did you send him with?" RICHARD replied, "Green." RICHARD continued, "FIFTY" (referring to fifty pounds of marijuana). RICHARD said, "One kilo, it's going over" referring once again to the kilogram of cocaine).

Later that same day, at approximately 5:32 p.m., RUIZ made an outgoing call over the RUIZ CELLPHONE to (818)581-8800, and spoke to RICHARD. During that conversation, RUIZ asked, "What deal did you work out with Jon?" RICHARD replied, "I worked out some green, and the white is going to go to you." RUIZ asked, "How much am I gonna owe your for the white?" RICHARD replied, "You said you're gonna give us twenty-two, right?" RUIZ replied, "Alright." RICHARD said, "The white one you're getting right now, it's from the same connection, from a different, not from the Bolivian guy, now it's from a Mexican guy."

Ruiz and Richard then had a conversation concerning the alleged cocaine deal:

Approximately thirteen minutes later, RUIZ made an outgoing call over the RUIZ CELLPHONE to (603)265-0476, and spoke to ROSALES. During that conversation, RUIZ asked, "The work that you gave me, can you get some more?" ROSALES replied, "Yes." RUIZ asked, "Like three whole ones?" ROSALES said, "Yeah." ROSALES continued, "There are some." RUIZ said, "It's going to be cash." See page 54.

On December 23, 2003, at approximately 6:18 p.m., RUIZ made an outgoing call over the RUIZ CELLPHONE to (617)908-0299, and spoke to MINOTTI. During that conversation, RUIZ said, "I'm just waiting for you to let me know if it's gonna happen." MINOTTI replied, "Yeah, hey, he wants 'm, it's just today he's wrapped up doing odds and ends and he told me first thing in the morning now, and I'm gonna try to commit." MINOTTI said, "I'd say like ten o'clock or something." See page 54.

-7-

From the telephone conversation it appears that the cocaine deal will happen on December 24, 2003 at 10:00 a.m.. Appreciating this fact, a black Mercedes is allegedly seen in Minotti's driveway on December 24, 2003 at 9:05 a.m. and is gone by 9:42 a.m. If this deal involves Bucci, why did the black Mercedes leave? Especially when Ruiz shows up at 9:55 a.m.

It makes no sense that supposedly sophisticated drug dealers, who are allegedly involved with three (3) kilos of cocaine, would prefer a public place to a private house.

As stated on page 55, Ruiz at some point got out of his vehicle carrying a "black plastic bag" and returned to the area of the garage. Minotti and Ruiz then reappeared from the garage area and went to Ruiz's vehicle. They then drove around the block and returned to Minotti's Mercedes. Minotti got out of the vehicle, went towards the garage, and ten (10) minutes later returned to the car and left at 10:20 a.m.

The above is based on surveillance of Minotti's house by agents, but this surveillance raise more questions then it answers. First, it does not appear that the cocaine - if it existed - left Minotti's house after Ruiz brought it to the garage in the "black plastic bag." Second, if Bucci was "that guy," why not do the deal at Minotti's house? Third, why didn't the agent arrest Minotti and Ruiz at that point? Fourth - and this is the biggest question - when did Minotti begin his work for the government? Fifth, when did Ruiz begin his work for the government? Sixth, how many agents were at the Malden Medical Center, and how were they dressed? Seventh, how did they know to go to the Malden Medical Center?

As stated on page 56, there were agents from DEA and state police present, and the question is, how did they know unless Minotti was cooperating prior to the alleged deal? This also raises the issue that Ruiz was also cooperating. In fact, the main question

-8-

is whether Minotti and Ruiz set this deal up to give Jordan to the authorities as part of their cooperation. Minotti, appreciating the drug problem of Bucci, lured Bucci there as the fall guy. This alleged deal makes no sense and it is impossible to explain all these questions without full knowledge of Minotti's role. Where was the money for this deal – and who supposedly had the money? Again, a close scrutiny of the facts raises more questions then it answers.[5]

Why was there no arrest at Minotti's house? What happened to the cocaine and marijuana from Richard? Why was Minotti not indicted? What happened to the alleged three (3) kilos of cocaine? In short, this case does not appear to be what the government states that it is and as such, the culpability of Bucci is seriously in question and he deserves the right to bail as been granted his co-defendants. Further, as previously stated there are conditions that will insure his return to court and protect the community.

---

[5] See pages 56 and 57. It is also interesting to note that Ruiz refers to "one asshole," not two, supporting the conclusion that Bucci is a fall guy and not perpetrator.

-9-

Respectfully submitted,
FOR THE DEFENDANT,

Barry P. Wilson
LAW OFFICES OF BARRY P. WILSON
240 Commercial Street
Suite 5-A
Boston, MA  02109
617) 248-8979
(617) 523- 8700 (Fax)
BBO# 529680

Dated: 7/22/04

Conversations about Fraudulent Activity

37.    In several intercepted conversations, it also appears
that MINOTTI and JORDAN have discussed potentially fraudulent
activity.  For example, in several intercepted conversations,
MINOTTI appeared to be arranging to finance the purchase of a
property with JORDAN.  In a conversation on March 5, 2004,

31

0000000331

MINOTTI advised JORDAN that another person was "into the house for 438. And then he wanted 20 in cash which brings it to 458. Or he wants 468 on the books." I believe that JORDAN and MINOTTI may be offering to provide $20,000 in cash as part of their effort to purchase a property at a price lower than the price that would otherwise be reflected on the transaction's paperwork.

38. In a conversation on March 4, 2004, MINOTTI told JORDAN that "I can't have my name on any checks right now." Later in the conversation, JORDAN stated "Well, if you know how to get around that you just fucking go to their bank and cash it where the check was written and there's no record of it." I believe that MINOTTI was attempting to prevent his name from appearing on checks related to certain financial transactions.

39. In a conversation intercepted on March 4, 2004, JORDAN and MINOTTI discussed an effort to purchase house lots in Malden for $1 million that would be sold by the Malden Redevelopment Authority. When they discussed the possible need to bid for the properties in a sealed bidding process, MINOTTI stated, "ask him what it's gonna take to get them." Later, MINOTTI stated "Listen to me. If you can work this out, I don't know what your connections are over there, but if you can work it out, and try to get in the back door and I have somebody buy it, I end up getting the listings. So seven house lots at 20,000 a whack for

32

me depending on what they're going for.  I'll split it right down
the middle with you."  JORDAN replied "Alright."  MINOTTI then
stated, "We can walk out of there making a hundred thousand
each."  Later, MINOTTI stated "Alright, just stay on it.  Say
'Look Grass, what do I gotta do to get these lots?  I got a
realtor who will.  We have a guy who will buy them' you know."
JORDAN replied "Right."  MINOTTI stated "Tell him we'll duke him
too.  Whatever we gotta do."  Jordan replied, "Alright."  In
another conversation on March 5, 2004, MINOTTI stated to JORDAN
"If this guy, if there's a way to backdoor this thing, you know,
you tell what's his name, uh, Grasso?"  He further stated "Tell
him, 'Look, where to we need to be?'  Tell him 'When the bids
come in, where do we need to be to get this?'"  Based upon my
review of these calls, I believe that that MINOTTI and JORDAN
were discussing possible financial crimes, including using
bribery ("we'll duke him too") or other fraudulent means to
obtain properties from the Malden Redevelopment Authority.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| VS. ) | CRIMINAL ACTION NO. M.J..No. 04CR10194RCL |
| ) | |
| ANTHONY BUCCI ) Defendant. ) | |

## CERTIFICATE OF SERVICE

I, Barry P. Wilson, do hereby certify that I did serve one (1) copy of the within "Motion for Reconsideration of Detention," by United States Mail, postage pre-paid and fax on Monday, June 7, 2004, to John Farley, A.U.S.A., United States District Court, 1 Courthouse Way, Suite 9200, Boston, MA 02210

Date: _7/20/04_

Barry P. Wilson