**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| v. | ) | **Criminal No. 04-10194-RCL** |
| | ) | |
| **ANTHONY BUCCI,** | ) | |
| **DAVID JORDAN** | ) | |
| **FRANCIS MUOLO** | ) | |
| Defendants. | ) | |

**Government's Opposition to Defendant Bucci's Motion to Suppress**

The United States of America, by and through Assistant United States Attorney John T. McNeil, respectfully submits this opposition to the defendant's motion to suppress evidence seized from his car after his arrest, and his related motion to suppress statements he made to officers after being taken into custody. (Doc.No. 130).

In sum, the Court should reject the defendant's motion to suppress evidence seized from his automobile because that vehicle was forfeitable under 21 U.S.C. §881(a)(4), and was properly seized for that purpose at the time of his arrest. The seizure and subsequent search of the vehicle in this case fall squarely within the applicable forfeiture statutes and the DEA policies for searching forfeited vehicles. Moreover, the seizure in this case is nearly identical to one upheld by the Supreme Court in Florida v. White, 526 U.S. 559 (1999)(affirming warrantless search and seizure of forfeitable vehicle found in a public area).

Even absent authority to seize the automobile for forfeiture, officers' search of the vehicle would have been reasonable as a search incident to arrest under Thornton v. United States, 124 S.Ct. 2127 (2004) and New York v. Belton,453 U.S. 454 (1981). The defendant was opening his car door at the time of his arrest. In that circumstance, the bright-line rule permitting

1

the search of an automobile incident to arrest applies. In addition, had officers not seized the vehicle for forfeiture, they had authority to impound the vehicle for safekeeping after the arrest of the driver, and authority to conduct an inventory search of that vehicle.

Finally, the defendant's claim that his <u>Mirandized</u> statements to officers should be suppressed because they were the product of an unlawful search must be rejected. As noted, the search of his automobile was lawful, and the statements were not the product of an unlawful search. Second, even if the search were unlawful, it did not taint statements made by Bucci because there was no causal relationship between the search of the vehicle and his statements.

### Relevant Facts[1]

In mid-December 2003, law enforcement officers from the United States Drug Enforcement Administration (DEA), in conjunction with state and local law enforcement officers, were investigating the narcotics dealing activities of a number of individuals including a man named Carlos Ruiz. On or about December 15, 2003, law enforcement officers obtained authorization from this Court (Stearns, J. presiding) to intercept wire communications on Ruiz's mobile telephone. Between December 20, 2003 and December 24, 2003, law enforcement officers learned from these wire interceptions that Ruiz planned to sell three kilograms of cocaine through John Minotti to defendant Anthony Bucci.[2] Ruiz knew Bucci and Minotti from

---

[1] This section outlines a preliminary statement of the evidence which the government anticipates it will present at a hearing on Defendant Bucci's motion to suppress. If the evidence elicited at that hearing differs in any material way from this preliminary statement, the government intends to rely on the evidence so elicited.

[2] The wholesale value of the cocaine was approximately $80,000.

prior cocaine transactions with them.[3]   The transaction was scheduled to take place in the late

morning of December 24, 2003, in a parking lot at the Malden Medical Center in Malden,

Massachusetts.

While it was unknown to Ruiz and to the law enforcement officers monitoring Ruiz's

cellular telephone, Bucci, Minotti and two co-conspirators -- Malden Police Detective David

Jordan and Francis Muolo -- were conspiring to rob Ruiz of the three kilograms of cocaine when

Ruiz arrived at the Malden Medical Center parking lot.  Bucci, driving his Black Mercedes sedan

(MA Reg. 3802-YL), Muolo, and Minotti, met at Minotti's house in the early morning on

December 24, 2003, to plan the theft of cocaine.  These three co-conspirators subsequently drove

to the medical center parking lot to meet with Jordan, to survey the location, and to further plan

the theft.

The four co-conspirators agreed that Minotti would meet Ruiz at his house later that

morning and tell Ruiz that they would rendezvous with Bucci at the Malden Medical Center

parking lot.  Minotti was to tell Ruiz that Bucci worked at the medical center in order to justify

meeting him at that location.  They also agreed that once Minotti and Ruiz met up with Bucci in

the parking lot, Defendant Jordan would pull up to the scene, identify himself as a police officer,

and pretend to break up the drug transaction.  When Jordan pulled up, Minotti was to take the

three kilograms of cocaine from Ruiz and run from the parking lot into a wooded area adjacent to

that lot.  Muolo would be waiting in a car on the other side of those woods to meet Minotti

carrying the cocaine, and would drive Minotti and the narcotics from the scene.  Minotti planned

to tell Ruiz after the theft that when he saw the police officer he ran with the drugs to avoid

---

[3]  Bucci had told Ruiz that his name was "Gino," and Ruiz knew him only by this name.

arrest.  He also planned to tell Ruiz that he dumped the cocaine in the woods and that the police ultimately recovered the drugs from that location.

After the plan was in place, Minotti returned home to await Ruiz's arrival.  Bucci drove to the Malden Medical Center parking lot in his black Mercedes Benz and parked that car in the planned location in the back lot; Bucci then went into the medical center.  Muolo took up position in a car on the opposite side of the wooded area.  Jordan set up at an unknown location, ready to be called in to stage the fake drug bust.

As planned, Ruiz, under the surveillance of law enforcement officers, met with Minotti at Minotti's home.  The two men drove to the Malden Medical Center parking lot and parked next to Bucci's black Mercedes Benz.  Bucci came out of the medical center to meet them.  While Ruiz, Minotti and Bucci were standing next to Bucci's Mercedes Benz, Jordan pulled into the lot and rammed the back of Ruiz's car.  Jordan came out of his car and held his handgun on Ruiz and Bucci, identifying himself as a police officer.  As planned, Minotti ran through the woods with the cocaine, met up with Muolo on the other side of the woods, and proceeded to Muolo's house with the cocaine.  Jordan went through the motions of pat frisking Ruiz and Bucci, allegedly called in Ruiz's identifying information, and then told the two men that it was their lucky day, and to leave the parking lot.

While driving from the parking lot and away from the scene, Ruiz placed several calls to his associates on his cellular telephone.  Ruiz told them that he had been held up and robbed of the cocaine by Minotti and Bucci, and a "supposed" detective.  It was evident from these calls that the four co-conspirators' staged drug bust was a patent fabrication to steal cocaine from Ruiz.

4

Bucci walked from the parking lot to the medical center on foot.  Jordan circled the parking lot several times, evidently to determine whether any law enforcement officers had been surveilling the transaction.  Jordan then pulled to the front of the medical center, got on his cellular telephone, and Bucci came out to meet him a few moments later.  Bucci leaned into Jordan's car, and the two men spoke for a short time.  Jordan then left the medical center area.  Bucci subsequently departed in his black Mercedes Benz.

Shortly thereafter, Bucci met with Minotti and Muolo at Muolo's residence in Stoneham.  There Bucci took possession of the three kilograms of cocaine in order to sell it, and he drove away from Muolo's house.  It can be inferred that Bucci transported the narcotics in his black Mercedes Benz at this point in the conspiracy.

Between December 24, 2003, and May 20, 2004 – the date on which officers arrested Bucci, Jordan, Muolo and Minotti – law enforcement officers conducted an investigation of the drug transaction they observed in the Malden Medical Center parking lot.  While officers knew that Minotti, Bucci and Ruiz were involved in the transaction from their observations in the parking lot and the interception of Ruiz's mobile telephone communications, they did not know of Muolo's involvement until sometime later.  In addition, they needed to confirm the claim that Ruiz made to his associates that Jordan was in fact part of a scheme to rob him of the cocaine.

During this period of investigation, officers recorded telephone conversations with Jordan when Jordan attempted to determine whether Ruiz was under investigation, obtained authorization to intercept Minotti's pager and mobile telephone communications, and monitored the activities of Bucci, Minotti, Jordan, and later, Muolo.

On May 18, 2004, law enforcement officers approached Muolo and sought his

cooperation in the investigation.  Muolo initially cooperated by telling officers of his involvement in the conspiracy – albeit, minimizing  the extent of his knowledge and involvement in the conspiracy – and agreed to make a recording of a conversation with Minotti.  Muolo's attempt to reach Minotti in the presence of officers that evening failed.  Officers met with Muolo on the following day, May 19, 2004, and learned that Muolo had tipped-off Minotti to their efforts to cooperate Muolo.  Officers then approached Minotti, who confessed his involvement in the scheme, and agreed to make a recording of Jordan.

Minotti, fitted with a body wire, met with Jordan at an ice rink in Malden on May 19, 2004.  During the recorded conversation, Minotti told Jordan that he had been interviewed by law enforcement officers and that the officers did not believe a story which he and Jordan had fabricated to cover their involvement in the cocaine theft on December 24.   During the conversation, JORDAN asked "What are they saying about me?"  Later, he stated that Minotti had introduced him to Bucci and Muolo and later described them as "weak links."  In discussing what Minotti should say to law enforcement officers, Jordan also stated "You can't fucking tell them that I was involved."  Jordan instructed Minotti to "tell Skeeter (Muolo) to keep his mouth shut."  Jordan attempted to pat down Minotti and stated "You better not be a rat on me."  Jordan further stated "They got nothing" and advised Minotti that they needed to "stick together" and that Minotti should not mention Jordan's name.

On May 20, 2004, officers lodged a federal complaint charging Bucci, Jordan, Muolo, and Minotti with a conspiracy to distribute cocaine in violation of 21 U.S.C. §846, and obtained arrest warrants for the men.  Officers were particularly concerned with the arrest of Bucci and Jordan.  Bucci had a prior federal conviction for narcotics distribution, had bragged on a

recorded call with Minotti that he had severely beaten a government cooperator in a prior case, had been binging on cocaine and other drugs, and had been living in various hotel/motel rooms over a several month period with no fixed address. Officers concluded that he was both a substantial danger to them, and that he was a substantial flight risk. With respect to Jordan, officers knew that he would be armed and were concerned that Jordan may turn his weapon on officers or on himself.

On May 20, 2004, officers surveilled several locations to which Bucci had some connection. At approximately 4:30 p.m. officers discovered Bucci's black Mercedes Benz parked outside a tanning salon in Malden. Two officers remained in an undercover car in the parking lot until Bucci emerged from the tanning salon. Bucci, who was with his young son at the time, proceeded to his black Mercedes Benz, and began opening a door of the car. Two officers, DEA Agent Jean Drouin and Task Force officer James Picardi, then approached him, at least one of those officers pointing his firearm at Bucci and informing him that they were police officers. Drouin held his weapon on Bucci while guiding him to the ground with his hand. Picardi then placed cuffs on Bucci while Bucci was on the ground. Bucci did not resist arrest and was apprehended without incident. Shortly after the arrest, several other Task Force officers arrived on the scene and assisted in the removal of Bucci from the arrest location and the seizure and removal of Bucci's automobile.

Because Bucci was discovered and arrested in the City of Malden, officers were concerned that the arrest would be made known to members of the Malden Police Department. Officers were also concerned that Jordan, who was still an active narcotics detective for the Malden Police Department, would learn of Bucci's arrest over the police radio or from some

other law enforcement source, realize he was to be arrested next, and substantially increase the risks associated with his arrest.  As a result, officers removed Bucci from the scene of the arrest within minutes of the arrest.  In addition, officers also immediately seized Bucci's car and moved it from the scene to the Medford State Police barracks for inventorying and processing.  Rather than wait for a tow vehicle, a law enforcement officer drove the car from the scene.

Once at the state police barracks, officers ran a narcotics canine around and through the black Mercedes Benz.  This common practice was undertaken to determine whether there were any narcotics present in the vehicle – either in known compartments, or in hidden compartments within the vehicle.  The dog alerted on the middle console of the car.  That console was opened and approximately 90 grams of cocaine were discovered there.  The automobile was subject to a further inventory search.  In an unlocked briefcase on the front passenger seat officers discovered an electronic scale consistent with drug distribution, and an array of narcotics including oxycodone.  In the trunk of the car officers discovered a second, larger electronic scale.   All of these items were seized and placed into evidence.

## Argument

I.   **Bucci's black Mercedes Benz was properly seized by officers and subject to an inventory search, because it was forfeitable contraband discovered in a public area.**

At the time DEA agents seized Bucci's black Mercedes Benz on May 20, 2004, there was probable cause to believe that the Mercedes had been used to facilitate a narcotics conspiracy. The vehicle was therefore forfeitable under 21 U.S.C. § 881(a)(4).[4]  Under that forfeiture section,

---

[4]   Section 881(a) reads in pertinent part:

The following shall be subject to forfeiture to the United States and no property right shall exist in them:

a seizure may be made without a warrant if there is probable cause to believe that the property is subject to forfeiture and: (1) the seizure is made pursuant to a lawful arrest or search; or (2) another exception to the Fourth Amendment warrant requirement apply. See 18 U.S.C. § 981(b)(2)(B)[5]; 21 U.S.C. § 881(b) (property subject to forfeiture under Section 881 may be seized as set forth in 18 U.S.C. § 981(b)).

In this case officers had ample probable cause to conclude that Bucci's black Mercedes was subject to forfeiture because Bucci used the vehicle to facilitate the conspiracy to rob Ruiz of cocaine and subsequently distribute it. As noted above, officers observed the black Mercedes at Minotti's house early on the day of the theft. After interviewing Minotti on May 19, 2004, they learned that Bucci's purpose in meeting Minotti and others in the early morning of December 24 was to confer and plan the robbery. Officers also observed Bucci's car in the parking lot at the Malden Medical Center shortly before the theft on December 24, 2003. Again, the interview with Minotti confirmed that Bucci, Minotti, Jordan and Muolo intended to rob Ruiz of three kilograms of cocaine at that location, and Bucci had traveled to that location to carry out

---

. . .
(4)  All conveyances, including . . . vehicles . . . which are used, or are intended for use, to transport, or in any manner to facilitate the transportation, sale, receipt, possession, or concealment of all property [including controlled substances which have been manufactured, distributed, dispensed or acquired in violation of the Controlled Substances Act].

[5]  Section 981(b)(2) reads in pertinent part:

Seizures pursuant to this section shall be made pursuant to a warrant . . . except that a seizure may be made without a warrant if --
(B) there is probable cause to believe that the property is subject to forfeiture and –
    i.  the seizure is made pursuant to a lawful arrest or search; or
    ii.  another exception to the Fourth Amendment warrant requirement would apply.
. . .

the crime.  Moreover, officers could reasonably infer that Bucci's car was strategically placed in the lot so as to be near a location where Minotti could run from the lot and into the woods. Officers could also infer that the black Mercedes was used as the magnet to draw Ruiz to that specific location in the parking lot.

In addition to using the black Mercedes to facilitate his meeting with co-conspirators, to facilitate his presence at the crime scene, and to assist in the orchestration of the scheme to steal the cocaine from Ruiz, Bucci used the vehicle to leave from the scene of the crime.  Officers saw Bucci drive away from the parking lot in the black Mercedes after the theft on December 24, 2003.

Officers also learned from Minotti on May 19, 2004, that Bucci was the co-conspirator who took possession of the cocaine after the theft, and sold two out of the three kilograms within days of the theft.  Officers could reasonably infer that since Bucci was driving the black Mercedes at the time of the theft, that he continued to drive that same vehicle when he took possession of the cocaine and transported it after meeting up with Minotti and Muolo at Muolo's house.[6]

Courts have routinely held that use of a vehicle either to meet with confederates in a drug

---

[6] On May 19, 2004, Minotti told officers that he dropped the cocaine in the woods while running from the scene of the heist, and that Bucci retrieved it and brought it to Muolo's house that day.  He also said that Bucci took the cocaine from Muolo's house that day and sold a portion of it a short time later.  On May 20, 2004, as he was being arrested and without prompting from the officers, Minotti told officers that he wanted to correct his statement of the previous day.  He indicated that he brought the cocaine to Muolo's house, rather than Bucci, but maintained that Bucci took the cocaine from Muolo's house that day for its sale.  Under either scenario, Bucci used his car to transport the cocaine.  Moreover, Muolo, who was interviewed by officers on May 18, 2004, told them that Bucci was the one who took the narcotics from the scene of the heist.

conspiracy or to drive to the scene of a drug transaction itself, gives rise to probable cause to

forfeit such a vehicle under 21 U.S.C. § 881(a)(4). <u>See</u>, <u>e.g.</u>, <u>United States v. One 1979 Porsche</u>

<u>Coupe</u>, 709 F.2d 1424, 1427 (11th Cir.1983) (per curiam)("the cases establish that under § 881 it

is not necessary for the subject vehicle either to have transported the illegal substance (or the

purchase money) or to have served as the location for the transaction. . . The subject vehicle in

this case was used to transport the pivotal figure in the transaction several hundred miles to the

precise location at which the attempted purchase took place")(citation and quotations omitted);

<u>United States v. One 1974 Cadillac Eldorado Sedan</u>, 548 F.2d 421, 426-27 (2nd Cir.1977)

("decisions of the Southern District have not hesitated to approve forfeitures where the vehicle

was not used to transport or conceal contraband or as a place to negotiate or consummate a sale

of drugs, but rather as a conveyance of the trafficker"); <u>United States v. One 1984 Cadillac</u>, 888

F.2d 1133, 1137 (6th Cir.1989) ("The conveyance of [co-conspirators] in the Cadillac to and

from the June 7 meeting did facilitate the sale of the drug, and for the reasons we have given was

within the letter and the spirit of section 881(a)(4) of the statute"); <u>One Blue 1977 AMC Jeep</u>

<u>CJ-5 v. United States</u>, 783 F.2d 759, 761 (8th Cir.1986) (forfeiture sustained where jeep was

driven to several meetings for discussions of use and proposed purchase and sale of narcotics);

<u>United States v. One 1977 Cadillac Coupe de Ville</u>, 644 F.2d 500, 503 (5th Cir. 1981) ("The use

of the Cadillac in transporting [a defendant] to the site facilitated the transaction by enabling her

to consummate the sale at the prearranged time and place. We conclude such use of the vehicle

to transport the dealer to the scene forms a sufficient nexus between the vehicle and the

transaction to validate forfeiture"); <u>United States v. One 1982 Buick Regal</u>, 670 F.Supp. 808,

811-12 (N.D.Ill.1987) (" a vehicle may be used to facilitate an illegal controlled substance

transaction within the meaning of sec. 881(a)(4) even though there is no evidence that the contraband was actually transported in the vehicle. . . We believe that, properly construed, a vehicle is subject to forfeiture under sec. 881(a)(4)  if it is used to transport the peddler ... to the scene of the transaction or to a meeting where a transaction is discussed.")(citations and quotations omitted); United States v. One 1981 Ford F-100 Pickup Truck, 577 F.Supp. 221, 223 (D.Mass.1983) ("the government has established that the defendant vehicle was used to transport [a defendant] to the scene of a drug transaction. This is sufficient [for forfeiture].").[7]

Thus, even absent evidence that Bucci used the black Mercedes to transport the cocaine from Muolo's home to another location for distribution, officers had probable cause to seize the vehicle for purposes of forfeiture. Id.  Given the additional evidence that the car was actually used to transport contraband, there was ample probable cause to forfeit it. Id.

Once officers had probable cause to seize the vehicle, they could do so without a warrant. Both the applicable statute, 18 U.S.C. § 981(b)(2), and controlling Supreme Court precedent permit the warrantless seizure of an automobile when there is probable cause to conclude that the automobile facilitated a drug crime and when that automobile is found in a public area. See Florida v. White, 526 U.S. 559, 565-66 (1999).

_____

[7]  The only relevant First Circuit case, United States v. One 1972 Chevrolet Corvette, 625 F.2d 1026 (1st Cir. 1980), held that a vehicle does not facilitate a drug transaction so as to subject it to forfeiture unless an "antecedent relationship [exists] between the vehicle and the sale of narcotics." Id. at 1029.  Because Bucci drove the vehicle to meet with co-conspirators to plan the crime, drove to the location to commit the crime, used the vehicle as part of the crime, drove from the scene in the vehicle, and subsequently used the vehicle to transport the cocaine, the limited holding in One 1972 Chevrolet Corvette is inapposite.  See One 1981 Ford F-100 Pickup Truck, 577 F.Supp. at 222-223 (distinguishing One 1972 Chevrolet Corvette by concluding that defendant was driven to the narcotics transaction in the vehicle, establishing the necessary "antecedent relationship").

In <u>Florida v. White</u>, the Supreme Court concluded that so long as officers have probable

cause to believe that an automobile is forfeitable contraband, officers may seize the vehicle

without a warrant if it is in a public place.  <u>Id</u>.  In <u>White</u>, officers had observed the defendant use

his automobile on three occasions to deliver cocaine.  Several months after those observations,

officers arrested White on unrelated charges, and seized his automobile from his employer's

parking lot.  The sole reason for the seizure of the car was that it was forfeitable contraband

under Florida law as a result of the defendant's prior use of the car in drug transactions.  The

Court specifically noted that there were no exigent circumstances giving rise to the seizure of the

vehicle.  Once seized, officers performed an inventory search on the vehicle which revealed  a

small quantity of cocaine in the ash tray.  White was prosecuted for possessing that cocaine. <u>Id</u>.

at 562-66.

Relying in large part on <u>Carroll v. United States</u>, 267 U.S. 132 (1925), the Court in <u>White</u>

held in relevant part:

> In <u>Carroll</u>, we held that when federal officers have probable cause to believe that
> an automobile contains contraband, the Fourth Amendment does not require them
> to obtain a warrant prior to searching the car for and seizing the contraband. . .
> The principles underlying the rule in <u>Carroll</u> and the founding-era statutes upon
> which they are based fully support the conclusion that the warrantless seizure of
> respondent's car did not violate the Fourth Amendment. Although, as the Florida
> Supreme Court observed, the police lacked probable cause to believe that
> respondent's car contained contraband, they certainly had probable cause to
> believe that the vehicle itself was contraband under Florida law.  Recognition of
> the need to seize readily movable contraband before it is spirited away
> undoubtedly underlies the early federal laws relied upon in <u>Carroll</u>.

<u>Id</u>. at 563-64 (citations and footnote omitted).

In this case, officers had probable cause to conclude that Bucci's black Mercedes was

forfeitable contraband based on the evidence outlined above.  Bucci's vehicle was discovered in

a public area parked in front of a tanning parlor on Eastern Avenue in Malden. The vehicle was seized and subject to an inventory search, during which time evidence of a crime was found. These facts fall squarely within the holding in <u>White</u>. On this basis alone, this Court should reject the defendant's motion to suppress.

Even if the automobile was not seized in a public area, there is an additional basis to conclude that the warrantless seizure of the black Mercedes was proper. Officers were presented with exigent circumstances at the time of Bucci's arrest, and therefore the seizure was proper under 18 U.S.C. § 981(b)(2)(B)(ii). It was necessary for the officers to immediately seize the vehicle to ensure that the car was not driven away by one of Bucci's confederates. In fact, a woman who identified herself as Bucci's wife was present at the scene and was insisting that she be given the keys to Bucci's car. Officers had substantial reason to believe that the forfeiture of the car would be frustrated or prevented by Bucci's wife, particularly if she attempted to conceal or sell the vehicle in a short period of time. <u>See</u>, <u>e.g.</u> <u>Florida v. White</u>, 526 U.S. at 563-64 (need to seize "readily movable contraband before it is spirited away"); <u>United States v. Brookins</u>, 345 F.3d 231, 238 (4th Cir. 2003)(exigent circumstances present because automobile was readily movable and defendant's wife was present to take car from scene); <u>United States v. Forker</u>, 928 F.2d 365, 369 (11th Cir. 1991)("ability of the vehicle to become mobile is sufficient to satisfy the exigency requirement"). In addition, officers needed to remove Bucci and his vehicle from the scene of his arrest immediately because they were concerned that Bucci, his vehicle, or the presence of federal and state law enforcement officers and vehicles would attract the attention of the Malden Police Department. As noted above, to attract such attention to Bucci or his vehicle could substantially complicate the impending arrest of Jordan, an active member of the Malden

14

Police Department.

Once seized, officers were well within their authority to conduct a complete inventory search of the car.  See South Dakota v. Opperman, 428 U.S. 364, 372 (1976)("The decisions of this Court point unmistakably to the conclusion reached by both federal and state courts that inventories pursuant to standard police procedures are reasonable"); Cooper v. California, 386 U.S. 58 (1967)(upholding warrantless inventory search of car after forfeiture seizure).  Such an inventory search is required by applicable DEA policy.[8]  Moreover, since the vehicle had been used in a drug transaction it was prudent to ensure there was no additional contraband in the vehicle before it was put into service by law enforcement officers.

The inventory search properly included searching containers within the car, including the defendant's briefcase.  The DEA policy calls for searching such containers.[9]  So long as standard policies call for searching containers during an inventory of the contents of an automobile, the warrantless searches of containers do not violate the Fourth Amendment.  See United States v. Hawkins, 279 F.3d 83, 86 (1st Cir. 2002)(upholding warrantless search of closed container in

---

[8]     DEA policy reads in pertinent part, "A conveyance may be searched under any of the following circumstances: . . . (4) Pursuant to the seizure of a conveyance for forfeiture proceedings."  Agents Manual at §6651.5.  In addition, "DEA policy requires an inventory of all conveyances seized for forfeiture . . ."  Id. at §6651.6.  "Once it is determined that there is sufficient probable cause that a conveyance has been used in violation of the CSA, the conveyance will be seized by authorized DEA personnel.  The following procedures apply to the seizures of all conveyances: (1) The conveyance will be transported to a secure location as soon as possible and a thorough inventory search will be conducted.  All containers in the vehicle (whether locked or unlocked) will be opened and searched."  Id. at §6654.62(C).  The relevant portions of the Agents Manual are attached as Exhibit 1.

[9]   See fn 8, supra.

automobile when search was done pursuant to standardized, albeit unwritten, search policy). [10]

## II.    Officers had authority to search Bucci's vehicle incident to his lawful arrest.

Since Bucci was opening his car door at the time of his arrest and had a clear intent to enter the vehicle, even if officers did not seize the car for purposes of forfeiture, they had authority to take control of the vehicle and search the entire passenger compartment of it pursuant to Bucci's lawful arrest. A search incident to arrest in this case would have been consistent with the rule set forth in New York v. Belton, 453 U.S. 454 (1981). In Belton, the Supreme court held, "when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile." 453 U.S. at 460. Therefore, the discovery of the evidence in Bucci's car was inevitable if officers had not acted on their forfeiture authority.

While Bucci was not physically present in the vehicle at the time of his arrest, the Supreme Court and other courts have made clear that the Belton rule with respect to the search of automobiles incident to arrest, extends beyond those occupants sitting in the vehicle as officers approach. Relying on the notion that, "[i]n all relevant aspects, the arrest of a suspect who is next to a vehicle presents identical concerns regarding officer safety and the destruction of evidence as the arrest of one who is inside the vehicle," the Supreme court in Thornton v. United States, 541 U.S. 615, 124 S.Ct. 2127 (2004), recently confirmed that the Belton rule

---

[10] There was also a legally independent ground for searching the defendant's briefcase within the car. Once the narcotics dog indicated the presence of narcotics inside the car, that, coupled with other evidence, provided officers with probable cause to believe that there was evidence of a crime located in the car. Such probable cause independently justifies the warrantless search of the briefcase. See United States v. Ross, 456 U.S. 798, 824 (1982)(upholding warrantless searches of containers within an automobile if there was probable cause to believe that contraband could be contained within that container).

applies not only to individuals who are physically located within the vehicle at the time of the police encounter, but also apply to individuals who are immediately outside the vehicle.

In Thornton, the Supreme Court upheld the search of vehicle incident to the defendant's arrest, even though officers did not encounter the defendant until he had left his vehicle. The Court noted:

> A custodial arrest is fluid and the danger to the police officer flows from the fact of the arrest, and its attendant proximity, stress, and uncertainty. The stress is no less merely because the arrestee exited his car before the officer initiated contact, nor is an arrestee less likely to attempt to lunge for a weapon or to destroy evidence if he is outside of, but still in control of, the vehicle. In either case, the officer faces a highly volatile situation. It would make little sense to apply two different rules to what is, at bottom, the same situation.

Id. at 2131.

While the Supreme Court has yet to address the specific situation in this case, in which an individual is in the process of entering his car rather than recently departing his car, the principles of Thornton apply equally to persons entering or leaving a vehicle: an individual in the process of entering his automobile is at least as likely as an individual who has already left his vehicle to "attempt to lunge for a weapon or to destroy evidence." Id. In fact, at least two circuits have applied the holding in Belton to situations similar to that in this case. See, e.g. United States v. Sholola, 124 F.3d 803, 817 (7th Cir.1997) (applying Belton where the defendant's words and conduct linked him to the car and conveyed that the vehicle was his, or at least under his dominion and control despite the fact that the "defendant was not technically an occupant of the vehicle immediately prior to the search"); United States v. Franco, 981 F.2d 470, 472-73 (10th Cir.1992) (applying Belton where the defendant was arrested in an undercover agent's car near his automobile based on the fact that he accessed his automobile during the

17

transaction which established that he was in control of the automobile at the time of his arrest).

Moreover, it is of no moment that Bucci was placed in officers' custody before he entered the car; courts have routinely held that the arrestee may be under officers' full control when the search incident to the arrest takes place.  See Thornton, 124 S.Ct. at 2132 (Belton decision did not rely on arrestee's access to the passenger compartment of car);  Franco, 981 F.2d  472-473 (" The automobile search is generally reasonable even if the arrestee is already secured and away from the vehicle to be searched." citing  United States v. Cotton, 751 F.2d 1146, 1149 (10th Cir.1985); United States v. White, 871 F.2d 41, 44 (6th Cir.1989); Belton, 453 U.S. at 456, 101 S.Ct. at 2862)).  In addition, the exposure of the automobile to a drug-sniffing dog would also have been permissible as a search incident to arrest.  See, e.g. United States v. Patterson,  65 F.3d 68, 71 (7th Cir. 1995)(upholding exposure of automobile to narcotics dog).

III.    **Officers also had authority to impound the vehicle for safekeeping and to inventory the contents of it.**

DEA agents and the state and local officers working with them in this investigation, had authority to impound Bucci's car upon his arrest for safekeeping.  Courts have repeatedly held that officers, acting under their public safety authority, may impound a vehicle after the operator of that vehicle has been lawfully arrested.  See, e.g. United States v. Ramos-Morales, 981 F.2d 625, 626-627 (1st Cir. 1992)(upholding impoundment of automobile pursuant to standard DEA impoundment policy);  United States v. Rodriguez-Morales, 929 F.2d 780, 787-788 (1st Cir. 1991)(citing cases).  Once impounded, the law permits, and DEA policy requires, an inventory search to be conducted. See United States v. Staula, 80 F.3d 596, 603 (1st Cir. 1996)("when a driver is lawfully arrested and thus disabled from continuing his journey, the Constitution permits the police to carry out a routine inventory examination incident to impounding the

vehicle."); Exhibit 1 (DEA Policy) at §6651.5(5).

This case is readily distinguishable from United States v. Goodrich, 183 F.Supp.2d 135 (D.Mass. 2001), upon which the defendant heavily relies. First, the officers in Goodrich did not have probable cause to believe that the automobile had been used in a crime, nor did officers have a basis for forfeiting the vehicle. This fact alone is sufficient to distinguish Goodrich. In addition, the officers in Goodrich were not dealing with a potentially dangerous situation after Goodrich was taken into custody. Rather, the Court in Goodrich found that it would have been reasonable for officers to turn the automobile over to Goodrich's wife, and for her drive it away or have someone she chose drive it from the scene. Goodrich, 183 F.Supp.2d at 140. By contrast, in this case, law enforcement officers were facing a fast-moving and volatile situation involving multiple arrests in one afternoon. The fact that one of the targets in this case was a local police officer substantially increased the risk associated with these arrests. As noted above, officers needed to arrest Bucci and remove him and his vehicle from the scene without alerting Jordan or another member of the Malden Police Department to their activities. Given the need for swift and decisive action, it was reasonable for officers to adhere to their ordinary practice to impound a vehicle upon the driver's arrest.[11] That a woman claiming to be the defendant's wife appeared on the scene during Bucci's arrest did not place those officers under any obligation to vary from their standard policy, particularly when so doing could jeopardize the arrest of

---

[11] While DEA has no specific written policy for the conditions under which vehicles are to be impounded, the impoundment of vehicles for safekeeping is authorized in DEA's written search of conveyances policy and inventory search policy (See Exhibit 1 at §§6651.5(5) and 6651.6), and an agent will testify that it is DEA unwritten policy and practice to impound vehicles in such situations as that in this case.

Jordan.[12]   Given the rapidly evolving situation it was reasonable for officers to remain constant

to their practice of impounding the car.  Even under <u>Goodrich</u>, so long as officers' conduct was

reasonable, the impoundment and inventory search of an automobile is constitutional. <u>Id</u>.

**IV.    Bucci's Mirandized statements were not the fruit of an unlawful seizure, and should not be suppressed.**

Bucci claims that the statements he made to officers were the product of an unlawful

seizure and search of his vehicle and should be suppressed.  The Court should reject this

argument because, as argued above, the seizure and subsequent inventory search of his

automobile were lawful.

However, even if the seizure and search of his automobile were unlawful, the statements

Bucci made were unconnected with the evidence discovered in his automobile, and therefore the

statements were not the "fruit" of any alleged illegal conduct under <u>Wong Sun v. United States</u>,

371 U.S. 471 (1963).  The statements which Bucci seeks to suppress – his admissions that he

was asked to participate in the theft of cocaine from Ruiz, that he declined to participate in it,

and that he found someone else to take part in the theft – were not the product of the evidence

seized from his automobile.  Rather they were the product of police questioning based on

evidence lawfully obtained over a five month investigation, including interviews of two of

Bucci's co-conspirators, electronic interceptions, and observations of Bucci at the scene of the

crime.  Because his statements were not the product of evidence gathered in the search of his

vehicle, or the seizure of the vehicle itself, there is no basis for suppressing his statements.  <u>See</u>

---

[12]   In order for officers to turn the automobile over to the individual claiming to be Bucci's wife, at a minimum officers would have had to ensure that she was properly licensed to drive, and had the ability and the legal authority to take control over the vehicle.

United States v. Crews, 445 U.S. 463, 471 (1980)(noting that "fruit of poisonous tree" analysis not applicable where evidence was not product of police misconduct); United States v. Hughes, 279 F.3d 86, 89 (1st Cir. 2002)(noting that the weakness in causal link between illegally obtained evidence and evidence discovered from it was basis for denying motion to suppress).

Bucci makes no claim that officers confronted him with evidence discovered in his car at the time of his statements.  Moreover, Bucci makes no claim that the evidence found in his car had anything to do with the robbery which occurred five months before his arrest.  In fact, the officers who interviewed Bucci after reading him Miranda warnings were not aware of the evidence discovered in his car until after the interview was completed.  Thus, the seized evidence was not the "but for" cause of Bucci's incriminating statements, and the attenuation analysis set out in Brown v. Illinois, 422 U.S. 590 (1975) is not applicable to this case.

Even if one applies the tests for attenuation outlined in Brown to this case, this Court should conclude that Bucci's statements should not be suppressed. "Under Supreme Court precedent, the weakness of the causal connection, delay in discovery, and lack of flagrancy in the violation and like considerations may persuade a court that--even though some causal link may exist--a remote 'fruit' should not be suppressed." Hughes, 279 F.3d at 89 (1st Cir.2002) (citing United States v. Crews, 445 U.S. 463, 471 (1980) and Brown v. Illinois, 422 U.S. 590, 603-04 (1975)).  As noted above, the causal connection is weak at best.  In addition, any police misconduct in this case is minimal given officers' reasonable belief that they had authority to seize Bucci's car for purposes of forfeiture.  Thus, even under Brown, as applied by the First Circuit, this Court should reject the defendant's motion to suppress his statements.

**Conclusion**

For the reasons set forth above, the government respectfully requests that the Court deny the defendant's motion to suppress in all respects.

Respectfully Submitted,

MICHAEL J. SULLIVAN
UNITED STATES ATTORNEY

Date: June 3, 2005          By:     /s/ John T. McNeil

JOHN T.  McNEIL
Assistant U.S. Attorney
(617) 748-3252