UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v.                                                     )<br>)<br>DAVID JORDAN                                  )<br>    and                                                 )<br>ANTHONY BUCCI,                              )<br>        Defendants                                )  | CRIMINAL NO. 04-10194-RCL |

**GOVERNMENT'S SUMMARY OF TESTIMONY TO**
**BE OFFERED UNDER FED. R. EVID. 701 AND 702**

The United States of America, by and through Assistant United States Attorney John T. McNeil respectfully submits this summary of expert testimony to be offered under Fed.R.Evid. 701 and 702 and the qualifications of the testifying witnesses.

1. <u>DEA Forensic Chemist Ken Fuentecilla</u>

    A. Summary of Anticipated Testimony

Mr. Fuentecilla will testify regarding the chemical analysis of a white powdery substance taken from the center console of Defendant's Bucci's Black Mercedes Benz on or about May 20, 2004. Mr. Fuentecilla will testify that on or about February 17, 2006, he weighed the total of the substance which had been submitted to the lab in three separate tied plastic bags. The total net weight was 90.3 grams.[1] Mr. Fuentecilla will testify that he subjected a representative sample of the substance to analysis using a gas chromatograph/mass spectrometer and a Fourier Transform

---

[1] Mr. Fuentecilla will also testify that the white powdery substance was initially weighed and subject to analysis at the DEA lab on June 2, 2004, by Forensic Analyst Jennifer L. Merschoff. Her initial analysis indicated that the net weight was 91.2 grams. The difference between these figures is primarily due to the amount of the substance consumed in the testing process.

Infrared Spectrometer, instruments which are routinely used for determining the chemical composition of narcotics or other unknown substances. The results established that the substance is cocaine hydrochloride.

     B.  Qualifications and Bases for Opinions

Mr. Fuentecilla is a forensic chemist with the United States Department of Justice Drug Enforcement Administration Northeast Laboratory located in New York City. He has served in that position since May 2002. During that time he has performed chemical analyses on over 1,000 exhibits. More than half of those exhibits were determined to contain cocaine. Prior to joining DEA, Mr. Fuentecilla worked for approximately 18 months at the New York City Police Department crime laboratory performing trace analysis work.

Mr. Fuentecilla has testified as an expert witness regarding the chemical composition of narcotics on more than ten occasions in United States District Courts in Massachusetts, New York, Connecticut, New Jersey and Maryland. In addition, Mr. Fuentecilla regularly provides training for state, local and federal law enforcement agents in conducting narcotics field testing, narcotics identification, and pharmacology.

Mr. Fuentecilla has a bachelors of science degree in Forensic Science from the John Jay College of Criminal Justice in New York. In addition, he has attended a number of narcotics analysis trainings, as outlined on his resume attached as Exhibit 1. He has also received extensive in-house training and supervision at DEA at in the New York City Police Department laboratory.

2.   Trooper Jamie X. Cepero

A. Summary of Anticipated Testimony

Trooper Cepero will testify that he has reviewed the evidence seized from Defendant Bucci's car and person on or about May 20, 2004, including three separately wrapped packages of powder cocaine with a net weight of approximately 91 grams, two electronic scales, $6,563 in cash, one pager, five mobile telephones, six SIM (subscriber identity module) cards, and two pre-paid telephone cards. Trooper Cepero is also aware that there were no small vials of cocaine, no cocaine spoons, no straws, no razors, no mirrors, or other indicia of personal consumption found in Defendant Bucci's car or on his person at the time of his arrest.

Based on his examination of the evidence, as well as his training and experience, Trooper Cepero will testify, among other things, that:

- the three separately wrapped packages of cocaine were consistent with "31s," a denomination of cocaine routinely purchased and sold. A "31" typically weighs approximately 31 grams (including the plastic bag in which it is contained), and is a common fraction of a kilogram. (The other common fractions sold are a kilogram (1000 g), one half kilogram (500g), a "250" weighing one-fourth of a kilogram (250 g), a "125" weighing 125 grams, and a "62" weighing sixty-two grams.) The price of each "31" ranges between $600 -1000. Thus, the value of the cocaine discovered in Defendant Bucci's vehicle was $1,800 to $3,000. The price of a "31" depends on a number of factors including the relationship between the drug dealer and buyer.

- Selling cocaine is a cash business, and individuals dealing substantial quantities of cocaine can be found to carry large amounts of cash on their person or within areas under

their control;

- Narcotics are sold in accordance with their weight, thus electronic scales are used by dealers for weighing cocaine (and the materials used to cut the cocaine) while packaging it for sale. In this case there was one smaller electronic scale consistent with weighing street level dealing amounts (such as gram amounts), and one larger electronic scale consistent with weighing heavier wholesale amounts;

- Experienced dealers in narcotics routinely maintain multiple means of communicating with their customers and their sources of drugs, including multiple cell phones, SIM cards[2], pagers, and pre-paid telephone cards. Experienced large quantity dealers are conscious of law enforcement officers employing wiretaps, pen registers and other means for intercepting electronic communications regarding drug transactions. Such experienced dealers routinely vary their means of electronic communication to prevent or inhibit the interception of incriminating electronic communications. In addition, when communicating over telephones, experienced dealers often speak in vague, guarded, or coded language in discussing their illegal business in an effort to further inhibit or prevent detection;

- Individuals who possess cocaine exclusively for personal use rarely carry on their person or in their automobile quantities as large as 90 grams of cocaine. Rather, individuals who possess cocaine exclusively for personal use will carry a smaller quantity of cocaine in a vial or bag, and then replenish that vial or bag from a larger stash kept in a secure

---

[2] Trooper Cepero will also testify regarding the nature of a SIM card and how it is used in the handset of a mobile telephone.

location.  Personal users who do not also distribute cocaine rarely carry more than an "eight-ball" of cocaine, weighing 3.5 grams;

- Powder cocaine is typically consumed through "snorting" (sniffing through the nose) lines or small spoonfuls of cocaine.  Lines are typically laid out on mirrors, glass or other smooth non-porous surfaces with the use of a razor blade, and snorted through a straw or rolled-up dollar bills.  Lines typically weigh less than one gram.  When snorted with a spoon, less than one gram is consumed with each spoonful.
- Personal users routinely carry, or keep in close proximity, indicia of personal consumption such as straws, spoons, razors, and mirrors;
- If a personal user was seeking to purchase more than 31 grams of cocaine, it would be less expensive to purchase it as a "62" or a "125" than to purchase two or more "31s."  In addition, each time cocaine is divided into smaller amounts, it is typically cut with an agent which reduces the quality of the cocaine.  Thus, by purchasing cocaine in a single larger amount (such as a 62 or a 125), the purchaser would obtain higher quality cocaine with less cutting agent;
- Cocaine sold exclusively personal use (rather use in conjunction with distribution) is typically sold on the streets in North Shore communities in 1 to 3 gram quantities for $50 to $150.

Based on his training and experience, Trooper Cepero will testify that the specific quantity and packaging of the cocaine in this case is consistent with the distribution of cocaine rather than the exclusive personal use of cocaine.  He will also testify that the quantity and packaging, coupled with the presence of two electronic scales, a large amount of cash, and

5

multiple mobile telephones, SIM cards, and a pager, and the absence of personal use paraphernalia, is also consistent with the distribution of cocaine rather than exclusive personal use of that substance.

    B.  Qualifications and Bases for Opinions

Trooper Cepero's qualifications to testify are as follows:

Trooper Cepero is currently employed by the Massachusetts State Police, and holds the rank of Trooper First Class.  He has been employed by the State Police for the past 21 years and has been consistently involved in the investigation and interdiction of narcotics crimes during this period.  Since January of 2000, he has been assigned to the United States Drug Enforcement Administration ("DEA") Task Force 2 in the City of Boston as a Federal Task Force Agent (TFA) with his primary duties being the investigation of organized narcotics traffickers.  For approximately seven years prior to that he was assigned to the Criminal Division of the Massachusetts Attorney General's Office with his primary duties being the investigation of narcotics organizations throughout the Commonwealth of Massachusetts.  From the fall of 1987 to the winter of 1992, he was assigned to the Massachusetts State Police Detective Unit and later the DEA Narcotics Task Force at Logan International Airport as a federal narcotics Task Force Agent.  From the summer of 1984 to the winter of 1987, he was assigned to the Suffolk County Narcotics Task Force

Over the course of his career in narcotics enforcement, Trooper Cepero has been involved in hundreds of undercover narcotics investigations involving the distribution of cocaine, crack cocaine, heroin, marijuana, and designer drugs.  Trooper Cepero has routinely acted as an undercover agent negotiating for the purchase of narcotics, and receiving narcotics.

In over 100 investigations in which he acted as an undercover agent, Trooper Cepero purchased various quantities of cocaine from one gram to over 20 kilograms.  He has observed powder cocaine being cut and packaged for sale, he has observed crack cocaine being cooked, and he has observed powder cocaine and crack cocaine being consumed.  In these investigations Trooper Cepero's duties also included participating in the debriefings of dozens of defendants, informants, and witnesses who had personal knowledge regarding the use and sale of cocaine and other narcotics.

During the course of his law enforcement career, Trooper Cepero has been involved in over 100 arrests in drug related cases and executed an equivalent number of search warrants in drug cases.  As noted above, he has been personally involved in more than 100 undercover purchases of narcotics and has worked on numerous occasions with confidential informants who were dealing or consuming drugs.  In addition, he has performed surveillance of drug deals on countless occasions.

Trooper Cepero has also received extensive, specialized training in the field of narcotics identification and investigation.  His training has included courses at the Massachusetts State Police Academy and the United States Drug Enforcement Administration.  He has taken courses ranging from basic controlled substance identification to an advanced course narcotics identification and investigations, including courses on street-level dealing, smuggling of narcotics, and money laundering.

Finally Trooper Cepero has been qualified to testify as an expert witness in the field of narcotics enforcement on more than a dozen occasions in the Massachusetts Superior Courts in Suffolk County, Middlesex County, Worcester County, Norfolk County and Essex County.  He

has also testified as an expert on narcotics enforcement on several occasions in the United States District Court for the District of Massachusetts.

                                                  Respectfully submitted,

                                                  MICHAEL J. SULLIVAN
                                                  United States Attorney

Date: February 21, 2006                    By: *John T. McNeil*
                                                  JOHN T. MCNEIL
                                                  Assistant U.S. Attorney

## CERTIFICATE OF SERVICE

    I, John T. McNeil, Assistant United States Attorney, do hereby certify that this document, filed through ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and that paper copies will be sent to those indicated as non registered participants on this date.

                                                  By:  *John T. McNeil*
                                                            JOHN T. MCNEIL
                                                            Assistant U.S. Attorney