**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **CRIMINAL NO. 04-10194-RCL** |
| | ) | |
| **DAVID JORDAN** | ) | |
| **and** | ) | |
| **ANTHONY BUCCI,** | ) | |
| **Defendants** | ) | |

## GOVERNMENT'S TRIAL MEMORANDUM

The United States of America, by and through Assistant United States Attorneys John T. McNeil and S. Theodore Merritt, respectfully submits this trial memorandum in the above captioned case.  This memorandum briefly outlines the evidence, charges, and evidentiary issues which may arise during trial.

### Statement of Facts

### A. The Set-Up

In mid-December 2003, law enforcement officers from the United States Drug Enforcement Administration (DEA), in conjunction with state and local law enforcement officers, were investigating the narcotics dealing activities of a number of individuals including a man named Carlos Ruiz.  From a court-authorized wiretap of Ruiz's phone, law enforcement officers learned that Ruiz planned to sell three kilograms of cocaine[1] through John Minotti to defendant Anthony

---

[1] The wholesale value of the cocaine was approximately $80,000.

Bucci.[2]  Ruiz knew Bucci and Minotti from prior marijuana and cocaine transactions with them.[3]

The transaction was scheduled to take place in the late morning of December 24, 2003, in a parking

lot at the Malden Medical Center in Malden, Massachusetts.

 Unknown to Ruiz and to the law enforcement officers monitoring Ruiz's cellular telephone,

Bucci, Minotti and two co-conspirators -- Malden Police Detective David Jordan and Francis Muolo

-- were conspiring to rob Ruiz of the three kilograms of cocaine when Ruiz arrived with Minotti at

the hospital lot to sell the cocaine to Bucci .[4]   The plan was for Jordan to pull up to the scene,

identify himself as a police officer, and detain Ruiz while Minotti ran away with the cocaine.  Muolo

would be waiting in a car to meet Minotti with the cocaine.

### B. The Rip-Off

 On December 24, 2003, under the surveillance of law enforcement officers, Ruiz met with

Minotti at Minotti's home.   As the surveillance continued, the two men drove to the Malden

Medical Center parking lot and parked next to Bucci's car.   Bucci came out of the medical center

to meet them.  When Minotti got out of Ruiz's car carrying the three kilos,  Jordan pulled into the

lot and rammed the back of Ruiz's car.  As planned, Minotti ran through the woods with the cocaine,

met up with Muolo and proceeded to Muolo's house with the cocaine.  Jordan came out of his car

and held his handgun on Ruiz, identifying himself as a police officer.   He ordered both men out of

their cars and went through the motions of pat frisking Ruiz and Bucci.  Jordan called in Ruiz's

---

 [2]  Ruiz had been introduced to Bucci as "Gino" by Minotti at Bucci's request to disguise Bucci's identity.

 [3] These narcotics transactions are outlined in detail below.

 [4]  Bucci hatched the plan to rob Ruiz after Ruiz sold Bucci poor quality marijuana on two occasions.

identifying information to the Malden Police.  He did not call in Bucci.  Jordan then searched Ruiz's car, finding nothing.  Jordan then told the two men that it was their lucky day, and to leave the parking lot.

 Ruiz drove off and  Bucci walked back into the medical center.  Jordan circled the parking lot several times, evidently to determine whether any law enforcement officers had been surveilling the transaction.  Jordan then met with Bucci in the lot, and the two men spoke for a short time before departing.  Shortly thereafter, Bucci met with Minotti and Muolo at Muolo's residence in Stoneham.  There Bucci took possession of the three kilograms of cocaine in order to sell it.    Later that night, Bucci brought Minotti a bag of money, containing between $10- $20,000, most of which Minotti gave to Jordan.

### C. Cover-up Efforts

In order to make the conspiracy to possess and distribute cocaine succeed, it was necessary not only for Ruiz but for DEA to believe that Jordan had legitimately intervened in a drug transaction.  Thus, both on the phone and when Ruiz showed up at Minotti's house later that day, Minotti assured him it was not a set-up and had left the cocaine in the woods.  After Ruiz said he was going up there to look for the cocaine, Minotti called Jordan, who went back to the hospital and chased Ruiz away.  At the same time, Bucci had an associate, pretending to be "Gino", call Ruiz to assure him that there was no plot to steal the cocaine.

Jordan also tried to find out what DEA agents knew and convince them that he was conducting legitimate police work.  Agents recorded telephone conversations with Jordan in which Jordan attempted to determine whether Ruiz was under investigation by them.  He also falsely told them that Minotti was his informant who set up the deal at the hospital, but was not present when

it occurred. Jordan said that he was unable to arrest anyone or seize any drugs when "some Dominican" ran into the woods. In particular, Jordan also gave deliberately false information about the identity of Bucci and the color of his car.

When Ruiz would not relent in his efforts either to regain the cocaine or the money, Jordan, Minotti and Bucci agreed that he needed to be placated. Jordan returned most of his share of the cash to Minotti, who then gave Ruiz approximately $23,000.

After about a four-month investigation, agents confronted Minotti, who confessed his involvement in the scheme, and agreed to cooperate against Jordan. Fitted with a body wire, Minotti met with Jordan on May 19, 2004. Minotti told Jordan that he had been interviewed by law enforcement officers and that the officers did not believe a story which he and Jordan had fabricated to cover their involvement in the cocaine theft. Throughout the conversation, Jordan tried to persuade Minotti not to talk and implicate him. In discussing what Minotti should say to law enforcement officers, Jordan also stated "You can't fucking tell them that I was involved." Jordan instructed Minotti to "tell Skeeter (Muolo) to keep his mouth shut." Jordan attempted to pat down Minotti and stated "You better not be a rat on me." Jordan further stated "They got nothing" and advised Minotti that they needed to "stick together" and that Minotti should not mention Jordan's name.

On May 20, 2004, all four conspirators were arrested upon complaint. A search of Bucci's car resulted, among other things, in the seizure of 90 grams of cocaine, electronic scales, and more than $6,000 in cash.

**Offenses Charged**

Defendants Jordan and Bucci, along with Francis Muolo, were charged in an eight count

indictment dated July 6, 2004. Their co-conspirator, Jon Minotti, was subsequently charged in a four count criminal information dated October 26, 2004. Minotti has since pleaded guilty to three charges which mirror the charges Defendant Jordan and Bucci face in Counts 1-3 of the indictment; Minotti has also pleaded guilty to a related charge of possession with intent to distribute marijuana. Muolo has pleaded guilty to Counts 1 and 2 of the indictment also pending against Jordan and Bucci.

**Defendants Jordan and Bucci**

Defendants Jordan and Bucci are charged together in Counts 1-3. In Count 1, they are charged, in violation of 21 U.S.C. §846, with conspiring with others, from in or about December of 2003, and continuing to on or about May 20, 2004, to distribute, and possess with intent to distribute, three kilograms of cocaine. In Count 2, they are charged, in violation of 21 U.S.C. §841(a)(1) and 18 U.S.C. §2, with knowingly possessing with intent to distribute three kilograms of cocaine on or about December 24, 2003, and aiding and abetting each other to do the same. Count 3 charges them, in violation of 18 U.S.C. §§924(c)(1)(A) and 2, with knowingly and intentionally using and carrying a firearm during and in relation to the drug trafficking crimes charged in Counts 1 and 2 and knowingly possessing such firearm in furtherance of those drug trafficking crimes.

In Count 5, Bucci alone is charged with possessing cocaine with intent to distribute it in violation of 21 U.S.C. §841(a)(1) on or about May 20, 2004, stemming from his arrest and the search of his car.

The elements[5] of Count 1, charging a violation of 21 U.S.C. §846, are:

**First**:          that from on or about December 2003 to on or about May 20, 2004, the agreement specified in the indictment, and not some other agreement or agreements, existed between the defendants, to possess with intent to distribute or to distribute cocaine; and

**Second**:          that the defendant willfully joined in that agreement.

The elements of Counts 2 and 5, charging a violation of 21 U.S.C.§§841(a)(1), are:

**First:**          that on or about [December 24, 2003][May 20, 2004], the defendant possessed cocaine, either actually or constructively;

**Second:**          that he did so with a specific intent to distribute the cocaine over which he had actual or constructive possession; and

**Third:**          that he did so knowingly and intentionally.

Alternatively, the government may prove beyond a reasonable doubt that one or both of the defendants aided and abetted the possession with intent to distribute cocaine by proving:

**First**:          someone else committed the crime of possessing cocaine with intent to distribute it; and

**Second:**          the defendant willfully associated himself in some way with the crime and willfully participated in it as he would in something he wished to bring about.

The elements of Count 3, charging a violation of 18 U.S.C. §924)c)(1)(A), are:

**First:**          **Either:** a) that the defendant committed the crime of conspiring to possess cocaine with the intent to distribute it from on or about December 2003 to on or about May 20, 2004, as described in Count 1 of the Indictment; **or** b) he committed the crime of possession of cocaine with intent to distribute it on or about December 24, 2003, or aiding and abetting that offense, as described in Count 2 of the Indictment; and

---

[5] The government has submitted proposed jury instructions which set forth the cases and model jury instructions upon which the government relies for the enumeration of these elements.

6

**Second:**        **Either**: a) that during and in relation to the commission of the crime charged in Count 1 or Count 2, the defendant knowingly used or carried a firearm; **or** b) that the defendant knowingly possessed a firearm in furtherance of the crime charged in Count 1 or Count 2.

With respect to Bucci's culpability in Count 3, the government is proceeding on a Pinkerton theory of liability.   See United States v. Shea, 150 F.3d 44, 50 (1ˢᵗ Cir. 1998)  ( "[W]e make explicit our view that a jury may be instructed on Pinkerton liability in connection with a charged violation of § 924(c) either as a sole or as an alternative theory of liability.").   Under that accepted principle, it is only necessary to prove that Jordan's possession of the firearm in furtherance of the conspiracy was reasonably foreseeable by Bucci. Shea, 150 F.3d at 50.  More recently, in United States v. Flecha-Maldonado, 373 F.3d 170, 179 (1ˢᵗ Cir. 2004),  the First Circuit held,

We have repeatedly held that under *Pinkerton,* the defendant does not need to have carried the gun himself to be liable under § 924(c). *See, e.g., United States v. Collazo-Aponte,* 216 F.3d 163, 195-96 (1st Cir.2000), *vacated on other grounds,* 532 U.S. 1036, 121 S.Ct. 1996, 149 L.Ed.2d 1000 (2001); *United States v. Shea,* 150 F.3d 44, 50 (1st Cir.1998). So long as there is sufficient evidence that a co-conspirator carried or used a firearm in furtherance of the conspiracy and that this was reasonably foreseeable to the defendant, the defendant can be held liable as if he himself carried or used the firearm. *See Shea,* 150 F.3d at 50.

**Defendant Jordan**

Defendant Jordan is also charged in Counts 4 and 6 through 8, with attempted witness tampering and making false statements to law enforcement officers.   These crimes were committed as part of, and in furtherance, of the drug conspiracy.   In Count 4, Jordan is charged with violating 18 U.S.C. §1512(b)(3) between December 24, 2003 and May 19, 2004 by attempting to intimidate and corruptly persuade others not to give truthful information to law

enforcement agents concerning the drug rip-off.  For example, Jordan instructed Minotti to tell investigating agents that Minotti was Jordan's informant and that he [Minotti] was not present at the hospital.  In the May 19, 2004 recorded conversation, Jordan repeatedly told Minotti to stick to the story and to make sure Muolo kept his mouth shut.

Specifically, Count 4 charges that Jordan did knowingly attempt to intimidate, threaten and corruptly persuade another person  with the intent to hinder, delay and prevent the communication to a law enforcement officer of information relaxing to the possible commission of a federal offense.  The elements of Count 4 are:

> **First:**     That on or about the date charged, the defendant knowingly used intimidation or knowingly corruptly persuaded another person, or attempted to do so;
>
> **Second**:     That the defendant acted with the intent to hinder, delay or prevent the communication to federal law enforcement officers of information related to the commission of a possible federal offense.

In Counts 6-8, Jordan is charged with knowingly and willfully making false and fraudulent material statements in a matter within the jurisdiction of the Drug Enforcement Administration, in violation of 18 U.S.C. §1001. All of these statements occurred in conversations recorded over the telephone by DEA in the days after the rip-off when Jordan was trying to ascertain what information DEA had and to mislead them into believing that Jordan had acted in a legitimate manner in the hospital parking lot by trying to break up a drug deal he learned about from an informant.   In Count 6, the false statement made by Jordan was that he forgot the name of the "Italian" that he had encountered on December 24, 2003.  In Count 7, Jordan falsely stated that his "informant" was at home when Jordan arrived at the hospital.  In Count 8, Jordan falsely stated that the Mercedes he observed in the hospital lot was "champagne" or "greyish."

The elements of Counts 6-8 are:

**First:**          that the defendant knowingly made a material false statement;

**Second**;          that the defendant made the statement voluntarily and intentionally; and

**Third:**          that the defendant made the statement in a matter within the jurisdiction of the Drug Enforcement Administration.

### POTENTIAL EVIDENTIARY ISSUES

**A.     Evidence of Related Unlawful Conduct including Fed.R.Evid. 404(b) Evidence**

**1.     Defendant Bucci**

The government intends to offer into evidence a series of three marijuana transactions and two cocaine transactions involving Bucci, Ruiz and Minotti which constitute a single course of conduct leading up to the theft of three kilograms of cocaine on December 24, 2003. These transactions include two purchases of marijuana in California which were funded and planned by Bucci in the fall of 2003, in which Bucci received poor quality marijuana from Ruiz and his connections in California. Minotti assisted Bucci in the purchase of this marijuana from California. The government will also offer evidence of a third marijuana shipment from California intended for Bucci to make up for the prior poor quality marijuana transactions, and Bucci's inspection and refusal to accept this third shipment. The evidence will reveal that Ruiz's failure to provide quality marijuana caused Bucci to plan and execute the robbery of cocaine from him. The government will also offer into evidence two cocaine transactions in November and December 2003, in which Bucci, in coordination with Minotti, purchased cocaine from Ruiz (each involving approximately $7,500 and 250 grams of cocaine); the testimony will reveal that Bucci used these purchases as a ploy to gain Ruiz's confidence and to set him up for the theft on December 24, 2003. The evidence will also

include Bucci's offer to sell Ruiz one kilogram of cocaine on the same day as the first sale of cocaine from Ruiz to Bucci.

These marijuana and cocaine transactions are admissible as direct evidence of the crimes charged in Counts 1, 2, and 3 of the Indictment because they are part of an ongoing course of conduct leading up to, and giving rise to, the charged conspiracy. "Evidence that pertains 'to a chain of events forming the context . . . and set-up of the crime, helping to complete the story of the crime on trial . . . [is admissible in appropriate cases] . . . where it possess[es] contextual significance." United States v. Sabetta, 373 F.3d 75, 83 (1st Cir. 2004) quoting United States v. Ladd, 885 F.2d 954, 959 (1st Cir. 1989); United States v. Raheman, 355 F.3d 40, 49-50 (1st Cir. 2004)(evidence of threats made in months before kidnapping introduced as "necessary description of events leading up to the crimes" and as intrinsic evidence of the defendant's intent to commit the kidnapping); United States v. Hite, 364 F.3d 874, 881 (7th Cir. 2004)("evidence concerning the chronological unfolding of events that led to an indictment, or other circumstances surrounding the crime, is not evidence of 'other acts' within the meaning of [Rule] 404(b)").[6] The marijuana and cocaine transactions in 2003 involving Bucci, Ruiz and Minotti are "part and parcel of the crimes being tried" and are simply not other crimes within the ambit of Rule 404(b).  United States v. David, 940 F.2d 722, 737 (1st Cir. 1991).

While these marijuana and cocaine transactions are admissible without reference to Fed.R.Evid. 404(b), they are also admissible as "specially relevant" evidence under Rule 404(b)

---

[6] See also  United States v. Taylor, 284 F.3d 95, 101 (1st Cir. 2002) (evidence of uncharged crimes not covered by Rule 404(b) because they were inextricably intertwined with charged offenses); United States v. Currier, 821 F.2d 52, 55 (1st Cir. 1987)(other acts admissible because they provided "both significant contextual material and proof of [an element of the offense]").

because they establish Bucci's motive, opportunity, intent, preparation, plan, and knowledge with respect to Counts 1-3. In particular, this evidence establishes that Bucci, who was observed by law enforcement officers at the scene of the theft, was not an "innocent bystander" and also establishes the criminal association among the co-conspirators. In admitting evidence of a prior uncharged narcotics crime, the First Circuit held in United States v. Tse, 375 F.3d 148 (1st Cir. 2004):

> In a conspiracy case, the district court may admit evidence of other bad acts if they tend to suggest a criminal association between the alleged conspirators. Evidence of a criminal association among alleged conspirators can be probative in several respects. It can demonstrate the background of a relationship, a collaboration among several parties, or a mutual trust between conspirators. It can also rebut a defendant's claim that his association with the alleged conspirators was innocent.

Tse, 375 F.3d at 155 (citations omitted).

Similarly, in United States v. Rodriguez, 215 F.3d 110 (1st Cir. 2000), in which the First Circuit upheld the introduction of several uncharged narcotics crimes, the court concluded:

> In a conspiracy prosecution, it is essential for the government to prove the defendant's knowledge of the voluntary participation in the conspiracy. In particular, the government's evidence must overcome the possibility that a particular defendant's association with the criminal co-conspirators was wholly innocent or that, if he was with them at the scene of the criminal activity, he was 'merely present,' without guilty knowledge or intent.

Rodriguez, 215 F.3d at 119. See also United States v. Devin, 918 F.2d 280, 286-287 (1st Cir. 1990)("our decisions recognize that evidence of uncharged conduct may reasonably be needed to relate the complete story of the charged crimes . . . [particularly] where the totality of the circumstances surrounding a relationship would have been more valuable to a factfinder as a means of putting discrete crimes for which [the] defendant was indicted into proper perspective.").

The government also intends to offer into evidence testimony regarding a series of narcotics transactions in which Muolo, Bucci and Minotti conspired to purchase marijuana in California and

to transport it to Massachusetts. These transactions occurred in the mid-1990s,[7] and like the later Bucci/Ruiz/Minotti transactions, are offered as evidence of Bucci's intent to commit the crimes charged in Counts 1, 2, and 3, and as evidence of the longstanding criminal association among Bucci, Muolo, and Minotti, as well as the trust established among these men necessary for carrying out the charged conspiracy. See United States v. Escobar-De Jesus, 187 F.3d 148, 169 (1st Cir. 1999)(admitting evidence of uncharged narcotics deal between the defendant and co-conspirators: "In a conspiracy case, evidence of other bad acts . . . can be admitted to explain the background, formation, and development of the illegal relationship, and more specifically, to help the jury understand the basis for the co-conspirators' relationship of mutual trust."); United States v. Rosa, 11 F.3d 315, 334 (2d Cir. 1993) (admitting evidence of uncharged narcotics and other crimes: "[w]e have held repeatedly that it is within the court's discretion to admit evidence of prior acts to inform the jury of the background of the conspiracy charged, in order to help explain how the illegal relationship between participants in the crime developed, or to explain the mutual trust that existed between coconspirators").

In addition, during the course of Muolo's and Minotti's testimony, it is likely that they will testify regarding the numerous smaller narcotics transactions between Bucci, Minotti, Muolo and others from 2002 to May 2004.[8] These routine narcotics transactions, particularly those between

---

[7] The gap in time between the marijuana transactions in the mid-1990s and the subsequent transactions with Ruiz in 2003 is partly explained by Bucci's arrest and federal conviction on marijuana distribution charges in 1997. Bucci was incarcerated for 41 months and served a period of supervised release following his sentence. See United States v. Anthony Bucci, Crim. No. 97-10269-PBS.

[8] The government does not have a current intention of offering testimony focused on these smaller transactions. However, in generally examining Minotti and Muolo, it may be difficult to present the course of events without any reference to these transactions.

Minotti and Bucci, formed a complex web of financial and personal dealings between the men which was a motivating factor for Bucci to ask Minotti, and to a lesser extent, Muolo, to engage in the theft of cocaine from Ruiz. See Tse, 375 F.3d at 155; Rodriguez, 215 F.3d at 119; Devin, 918 F.2d 286-287. Moreover, the testimony will reveal that during the later stages of the conspiracy, after Bucci had cheated Minotti out of the proceeds of the theft and failed to provide Minotti the profits from a real estate transaction in which the men were engaged, Minotti would offer small quantities of narcotics (such as Viagra) to Bucci in an effort to re-gain favor with him and to share in the proceeds of the theft. These transactions were integral to their relationship and the jury could not understand the complexity of the relationships between Minotti, Bucci and Muolo without some reference to these transactions. As such, they are admissible both as evidence of the conspiracy and under Rule 404(b) as probative of these crucial relationships. Id.; see also United States v. Green, 176 F.2d 541, 543-544 (1st Cir. 1949)("evidence of other criminal acts has been held admissible by this court when they are so blended or connected with the one on trial as that proof of one incidentally involves the other; or explains the circumstances thereof; or tends logically to prove any element of the crime charged" quoting Bracey v. United States, 142 F.2d 85, 87 (D.C. Cir. 1944)).

Bucci is charged in Count 5 of the Indictment with possession with intent to distribute approximately 90 grams of cocaine with intent to distribute it. The cocaine was packaged in three separate plastic bags reflecting "31s" or ounce quantities of cocaine for sale.[9] The government intends to offer testimony in which Bucci admits to distributing ounce quantities of cocaine to an individual named Robert Ramboli. These admissions are direct evidence of the crime with which

---

[9] See Government's Summary of Expert Testimony to be offered Under Fed.R.Evid. 701 and 702 [Doc. No. 191].

Bucci is charged; they are also admissible under Rule 404(b) as evidence of intent, knowledge, and absence of mistake. See Sabetta, 373 F.3d at 83; Tse, 375 F.3d at 155; Rodriguez, 215 F.3d at 119.

**2.    Defendant Jordan**

With respect to Jordan, the government intends to offer into evidence testimony regarding Jordan's purchase, possession and consumption of marijuana from and with Minotti in 2003 and 2004. The government also intends to offer into evidence Jordan's admission upon his arrest of presence of marijuana in his bloodstream and a package of papers for rolling marijuana joints which was found in his possession. In addition, the government intends to offer into evidence Jordan's knowledge and tacit assent to Minotti's distribution of pound quantities marijuana to one of Jordan's employees, Paul Demarco.[10] This evidence is being offered to establish the "background, formation, and development of the illegal relationship, and more specifically, to help the jury understand the basis for the co-conspirators' relationship of mutual trust." Escobar-De Jesus, 187 F.3d at 169. It was in the context of Minotti's discovery that Jordan smoked marijuana, and the trusting relationship that followed from that discovery, that Jordan first expressed an interest in engaging in the robbery of a narcotics dealer. The subsequent marijuana transactions between Minotti and Jordan are also highly probative of the close nature of their relationship and Jordan's willingness to engage in illegal conduct with Minotti. This evidence is particularly probative because at the time that Jordan was smoking, receiving and purchasing marijuana with and from Minotti, he was also the lead narcotics detective in the City of Malden. It is only through an understanding of the nature of the entire relationship between Minotti and Jordan, that the jury will

---

[10] In addition to his police work, Jordan operated a painting and light construction business. Minotti, who was a realtor and plasterer, frequently worked projects with Jordan.

understand how Minotti came to recruit Jordan to participate in the robbery of Ruiz. <u>See</u> <u>United States v. Diaz</u>, 994 F.2d 393, 395 (7th Cir. 1993)(admitting evidence pre-conspiracy cocaine deals to show "how the conspiratorial relationship between [conspirators] developed. This testimony established how the conspirators came to know each other, how they established a relationship of trust through their associations and how these events flowered into the charged conspiracy."); <u>Hite</u>, 364 F.3d at 881; <u>Devin</u>, 918 F.2d at 286-287. Jordan's admissions of marijuana in his blood stream at the time of his arrest, as well as the rolling papers found in his possession, will be offered to corroborate Minotti's testimony regarding Jordan's regular use of marijuana.

Finally, the government also intends to offer into evidence Jordan's statements upon his arrest regarding the presence of two non-police issue handguns – one of which had been reported stolen – in the automobile he used during the charged conduct. This evidence will be offered pursuant to Rule 404(b) to show opportunity, intent, and absence of mistake, among other things, with regard to Count 3 of the Indictment. This evidence is specially relevant because Jordan did not use his police-issued service weapon during the course of the robbery of Ruiz; thus, the presence of non-police issued handguns in his undercover vehicle is evidence of his access to and possession of such weapons. <u>See</u> <u>United States v. Hahn</u>, 17 F.3d 502, 509 (1st Cir. 1994)(admitting uncharged evidence of firearms possession and use in support of 924(c) charge, also noting that evidence of gun possession not necessarily a "bad act" under 404(b)); <u>United States v. Powell</u>, 50 F.3d 94, 100-101 (1st Cir. 1995)(evidence of defendant's possession of other guns admissible to show defendant's opportunity to obtain firearms and knowledge of availability).

## B.     Defendant's Statements

The government anticipates introducing a number of "statements" made by the defendants

Bucci and Jordan.  These statements, for the most part, can be classified into the following categories, which overlap to some extent: (1) statements of a particular defendant introduced  as party admission under Fed. R. Evid. 801(d)(2)(A); (2) statements made by Jordan to law enforcement which the government's evidence will show were false; (3) statements to other conspirators that constitute instructions and are verbal acts; and (4) statements admissible under Fed. R. Evid. 801(d)(2)(E) as coconspirator statements offered for the truth of their contents.

### 1.        Admissions Under Rule 801(d)(2)(A)

Under Fed. R. Evid. 801(d)(2)(A), statements made by a defendant are admissible against that defendant as non-hearsay when offered by the government.  For example, Bucci's statement upon arrest  – "You don't have me on any phones" – would be admissible as a party-admission. Similarly, Jordan's recorded statements to both DEA agents and to Minotti are likewise admissible against him under this rule.

### 2.        False Exculpatory Statements

As noted above, in order to make the conspiracy to possess and distribute cocaine succeed, it was necessary not only for Ruiz but for DEA to believe that Jordan had legitimately intervened in a drug transaction that was set up by his informant, Minotti.  Within days of the robbery, Jordan gave this version to DEA agents and told Minotti to say the same thing if questioned.  At the same time, Bucci, using Bryan Raftery pretending to be Bucci, called Ruiz to assure him that there was no plot to steal the cocaine.  These statements, which the government's evidence will prove were falsely exculpatory, are not offered for their truth. In this regard,  the Supreme Court has specifically held that out-of-court statements which are not offered for their truth, but for some other non-hearsay purpose, are admissible to prove the conspiracy, regardless of whether the

16

requirements of the co-conspirator hearsay exception rule are met.  Anderson v. United States, 417 U.S. 211, 218 (1974).  Here, these false statements made by Jordan and on behalf of Bucci to mislead Ruiz and law enforcement are non-hearsay evidence of the conspiracy itself.

**3.     Other Non-Hearsay Statements**

There will also be introduced statements made by some defendants to other conspirators and associates that, in essence, constitute instructions.  For example, Jordan instructs Minotti what to tell investigating agents and to tell Muolo to keep his mouth shut.  Bucci instructs Raftery what to say to Ruiz in making the phone calls.  These kinds of statements are admissible  as non-hearsay, because they are not offered to establish the truth of the matter asserted.  Fed. R. Evid. 801(c).[11]  See, e.g., United States v. Green, 887 F.2d 25, 27 (1st Cir. 1989); United States v. Hicks, 848 F.2d 1, 3 (1st Cir. 1988)(where there is no "truth or falsity" issue in the contents of statement, and thus no need to evaluate the credibility of the declarant, statement which was a request for assistance was admissible as verbal act and not hearsay).  "Statements proffered to show something other than the accuracy of their contents – to show, say, the knowledge or state of mind of the declarant or one in conversation with him – are not considered hearsay."  United States v. Figueroa, 818 F.2d 1020, 1026 (1st Cir. 1987).

**4.     Co-Conspirator Statements**

Many of the above-mentioned types of statements made by Jordan, Bucci and Minotti are also admissible as co-conspirator statements under Fed. R. Evid. 801(d)(2)(E).  For example, such statements include Bucci's statements made to Raftery describing the details of the drug rip-off,

---

[11]Of course, the statement is also independently admissible against the defendant who made it as an admission under Fed. R. Evid. 801(d)(2)(A).

which were made later that day in an effort to enlist Raftery's assistance in calling Ruiz. Similarly admissible under this rule are Jordan's statements to Minotti, caught on the body wire, "that you introduced me to this rat Skeeter and Bucci," which were made in the context of instructing Minotti to make sure Muolo and Bucci kept quiet.

To be admitted against both defendants under this Rule, the court need find, by a preponderance of evidence, that Bucci and Jordan were members of a conspiracy and that the statements were made during and in furtherance of the conspiracy. United States v. Petroziello, 548 F.2d 20, 23 (1st Cir. 1977). As for the Bucci statements to Raftery, there can be little doubt that they were made during the course of the conspiracy because not only had the conspirators yet to split up the proceeds, they had not yet convinced Ruiz that his cocaine was unretrievable. *See e.g.*, United States v. Hickey, 596 F.2d 1086, 1089-90(1st Cir. 1979)(statements made after defendants robbed a bank but before proceeds were divided were made "during the course" of conspiracy because the central objective of the conspiracy was not only to rob the bank but also to divide the proceeds); United States v. Davis, 623 F.2d 188, 192  (1st Cir. 1980)(acts of concealment such as false statements made to investigators were "during the conspiracy" because done in furtherance of main criminal objective).

Bucci's statements to Raftery about what happened, including the role of the officer and his concerns about lack of authenticity, were also "in furtherance" of the conspiracy. Statements are to be deemed in furtherance of a conspiracy when they "tend to advance the objects of the conspiracy as opposed to thwarting its purpose." United States v. Fahey, 769 F.2d 829, 839 (1st Cir. 1985).  "To be deemed 'in furtherance,' a statement need not be necessary or even important to the conspiracy, or even made to a conspirator, as long as it can be said to advance the goals of

the conspiracy in some way." <u>Martinez-Medina</u>, 279 F.3d 105, 117 (1st Cir. 2002).[12]

Regarding Jordan's statements to Minotti, the overall success of the conspiracy required that all the conspirators stick to the cover story or say nothing when confronted by DEA agents. As such, the conspiracy continued right through the May 19th conversation between Jordan and Minotti, and Jordan's efforts to make sure that Minotti kept Muolo and Bucci in line furthered the conspiracy. Thus, Jordan's statements to Minotti, designed to perpetuate their cover story, were directed toward the effectuation of the overall conspiracy to steal the cocaine, sell it, and not get caught. *See, e.g.*, <u>United States v. Fahey</u>, 769 F.2d 829, 838-39 (1st Cir. 1985) (false statement by co-conspirator to FBI agent, to induce agent into believing no fraud had occurred, was made in furtherance of the conspiracy); <u>United States v. Davis</u>, 623 F.2d 188, 190-92 (1st Cir. 1980) (false statements by co-conspirator to state fire marshal investigating fire were made in furtherance of the conspiracy); *see also* <u>United States v. Medina</u>, 761 F.2d 12, 17-18 (1st Cir. 1985) (statements made while co-conspirators were destroying incriminating evidence). The statements were also directed at furthering and concealing the conspiracy by reassuring Minotti and retaining his allegiance. *See e.g.*, <u>United States v. Beechnut Nutrition Corp.</u>, 871 F.2d 1181, 1191 (2d Cir. 1989)(co-conspirator statements to someone at risk of being accused of complicity made to reassure person and encourage him not to reveal information were in furtherance of the

---

[12]The fact that Raftery may not have been a conspirator himself does not matter. *See* <u>United States v. Piper</u>, 298 F.3d 47, 53 (1st Cir. 2002)("The black-letter principle is that statements made in the course of a discussion between a coconspirator and a third party who is a stranger to the conspiracy are admissible under Rule 801(d)(2)(E), provided that they meet the Rule's foundational requirements.").

conspiracy.)[13]

**C.    Out of Court Statements of Ruiz**

The government anticipates offering tapes of selected cell phone conversations, intercepted

on the Ruiz wiretap, between Ruiz and Minotti, Ruiz and his wife, Ruiz and an associate named

Tommy, and Ruiz and Raftery pretending to be Bucci.  While the Minotti and Raftery calls with

Ruiz are admissible for the reasons explained in the preceding section, Ruiz's other calls, in which

he recounts what just happened to him during the rip-off, including that the "cop" held a gun on him,

are admissible as excited utterances and/or as prior consistent statements.

**1.    Excited Utterances:  Rule 803(2)**

Shortly after the rip-off,  Ruiz made a series of phone calls that, unbeknownst to him at the

time, were recorded by the DEA.  These phone calls are admissible under Rule 803(2), Fed.R.Evid.,

as excited utterances.

The First Circuit has established a three pronged test for admission of statements under Rule

803(2):  (1) the declarant experienced a startling event, (2) the statement was made while the

declarant was subject to the influence of the event, and (3) the statement related to the event.  See

United States v. Collins, 60 F.3d 4, 8 (1st Cir. 1995); United States v. Bailey, 834 F.2d 218, 228 (1st

Cir. 1987).  The extent of a permissible time lapse between the exciting event and the statement

depends on whether the declarant is still  under the influence of the event.  See Bailey, 834 F.2d at

227-28.  "Testimony that the declarant still appeared 'nervous' or 'distraught' and that there was a

reasonable basis for continuing emotional upset will often suffice."  Id. (witness testified declarant

---

[13]As extensively analyzed in the Government's Opposition to Severance on Bruton
Grounds, [Docket #s 154, 155], the Bucci and Jordan statements are also independently
admissible as statements against penal interest under Fed. R. Evid. 804(b)(3).

was "sort of nervous [and] upset" when she told witness about startling event") quoting McCormick

on Evidence § 297, at 856 (E. Cleary 3d ed. 1984) (footnotes omitted). With tapes, when a "trial

court has access to a recording of the declarant's statement, it may also consider the declarant's

'tone and tenor of voice' . . . " in evaluating whether an individual is under the influence of an

exciting event. United States v. Alexander, 331 F.3d 116, 123 (D.C. Cir. 2003)..

   The government anticipates introducing two calls from shortly after the rip-off.  First, Ruiz

called his wife about 30 minutes after the rip-off telling her in an excited tone and rapid-fire Spanish

that he had just been robbed of three kilos and that a cop had hit him [his car] from the back.  Ruiz

was upset about having been robbed in what looked like a set-up.  His statement to his wife, a trusted

individual, captured contemporaneously on the wiretap, meets the criteria for admission  as an

excited utterance.  Similarly, Ruiz made a second phone call about an hour and half later to an

associate named Tommy in which he angrily stated that "that m-f just robbed me of 3 kilos" and said

that "the detective came behind me and stopped me and Jon ran with the s—t."   Ruiz's agitation

during the phone call evidences that he was still under the effects of the starting event at the time

of this second call.

   Statements made minutes or even hours after an exciting event are regularly admitted as

excited utterances if the declarant was still under the influence of the event.  See e.g.,  United States

v. Cruz, 156 F.3d 22, 30 (1st Cir. 1998) (finding no abuse of trial court discretion in admitting

assault victim's statement made approximately four hours after the assault ended, when victim

escaped to a women's shelter, because it was "likely that [the victim] continued to suffer from the

trauma of the beating when she fled to the women's shelter"); United States v. Phelps, 168 F.3d

1048, 1055 (8th Cir. 1999) (no abuse of discretion in admitting statements made to police officer

after shooting incident because "[t]he lapse of 15 to 30 minutes between an exciting incident and

a statement does not render the statement inadmissible."); United States v. Scarpa, 913 F.2d 993 (2d

Cir. 1990) (statements by victim of beating made five or six hours after beating were admissible

because there was little doubt victim still under stress of excitement caused by assault). Moreover,

taped conversations occurring after the exciting incident are also regularly admitted as excited

utterances. See Unites States v. Brito, 427 F.3d 53, 62 (1st Cir. 1995) (anonymous 911 call

reporting that declarant had "just" heard gun shots admissible); United States v. Alexander, 331

F.3d 116, 124 (D.C. Cir. 2003) (no abuse of discretion in admitting 911 phone call as excited

utterance when phone call was made 15 to 20 minutes after incident, declarant made phone call to

mother before calling 911, and declarant "sounded composed" on phone).

Here, Ruiz's phone calls describing the rip-off were made shortly after the exciting event

and while he was still under the influence of the surprise and shock of the rip-off. Furthermore,

because the calls were made to close, trusted individuals, it is further unlikely that his agitated

statements would be the product of calculated reflection rather than the kind of spontaneity that

underlies the excited utterance exception.

## 2. **Prior Consistent Statements**

It is anticipated that Ruiz will be cross-examined regarding his testimony about the events

in the hospital parking lot and, in particular, that a gun was brandished by the cop. The government

anticipates introducing two phone conversations in which Ruiz recounts that the cop held a gun on

him during the rip-off. These specific declarations made in the course of conversations between

Ruiz and Tommy and Ruiz and Minotti, are admissible as prior consistent statements under Fed.

R. Evid.801(d)(1)(B). They would also be properly admitted for rehabilitative purposes should

Ruiz's credibility be attacked.

Under Rule 801(d)(1)(B), a prior statement is not hearsay which is "consistent with the declarant's trial testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper motive or influence." The rule does not require the prior consistent statement to contradict testimony, but only to rebut an express or implied charge of fabrication. See United States v. Young, 105 F.3d 1, 9 (1st Cir. 1997) ("Nothing in the rule requires the prior consistent statement to contradict any testimony"). While such statements must antedate an alleged motive to fabricate, see Tome v. United States, 513 U.S. 150, 152 (1995), "whether a witness had a motive to fabricate when the prior consistent statements were made is plainly a question of fact to be resolved by the trial court based precisely on the particular circumstances of an individual case." United States v. Prieto, 232 F.3d 816, 821 (11th Cir. 2000). In this case the prior consistent statements come within hours of the rip-off in taped phone conversations intercepted by DEA. Unaware that he was being recorded and before he was arrested, Ruiz could not then have intended to frame the defendants. He simply had no motive to fabricate these statements at the time they were made.

In the alternative, Ruiz's description of the use of a gun contained in prior recorded conversations shortly after the event should be admissible for rehabilitative purposes of Ruiz after he is cross-examined about any inconsistent statements. See United States v. Simonelli, 237 F.3d 19, 27 (1st Cir. 2001)(where prior statements offered not for their truth but for purposes of rehabilitation, Rule 801(d)(1)(B) and its restrictions do not apply). In Simonelli, the Court noted that such prior statements can be admitted when the introduction of statements on cross-examination "created any unfairness or potential for misimpression." Id. at 28. Thus, where the defense may

23

attack Ruiz's trial testimony with any inconsistent statements about the description of the rip-off, his nearly contemporaneous statements on these issues are not barred by the hearsay rules and should be admitted to rehabilitate him as a witness.

**D.     Expert Testimony**

The government has filed an expert disclosure outlining the testimony to be offered under Fed.R.Evid.701 and  702. [Doc. No. 191].  In summary, the government intends to call Kenneth Fuentecilla from the New England Drug Enforcement Administration Lab in New York City.  He will testify regarding the weight of the white powdery substance submitted by agents to the lab as well as the various tests performed on that substance to determine that it was in fact cocaine hydrochloride.  Such expert testimony is routinely admitted in these types of cases.  *See e.g.* United States v. Terry, 240 F.3d 65, 74 (1st Cir. 2001); United States v. Richardson, 225 F.3d 46, 50 (1st Cir. 2000).

The government will also offer the testimony of Trooper Jamie Cepero from the Massachusetts State Police as an expert on narcotics distribution.  As outlined in the disclosure, the Trooper Cepero will testify as the value and packaging of the cocaine found in the defendant's possession, the manner in which such narcotics  are typically sold and consumed, the "tools of the trade" including the relationship between narcotics, cash, electronic scales, and multiple mobile telephones and SIM cards, and his opinion that the quantity and packaging of the cocaine – particularly when coupled with the presence of the other evidence found in his car and the lack of evidence of personal consumption –  is consistent with distribution.  This type of expert testimony has also been regularly admitted to establish the defendant's intent to distribute.  See, e.g. United States v. Reynoso, 336 F.3d 46, 49 (1st Cir. 2003)(approving expert testimony on typical

quantities possessed for distribution and personal consumption); United States v. Valle, 72 F.3d 210, 216 (1st Cir. 1995)(approving expert testimony that quantity and packaging of substance was consistent with distribution); United States v. Andrade, 94 F.3d 9, 13 (1st Cir.1996); United States v. Bergodere, 40 F.3d 512, 518 (1st Cir. 1994)(affirming conviction, relying on part on expert testimony that "the quantity, packaging, and value of the heroin indicated that it was intended for distribution").

### E.     Defendant Bucci's Criminal Record

The government intends to offer Bucci's prior federal narcotics conspiracy conviction into evidence, along with his admissions regarding the facts underlying that conviction, pursuant to Fed.R.Evid. 404(b) if he claims with respect to the charges in Counts 1-3 or Count 5, that he had no knowledge of the drugs or claims that he did not intend to distribute them.  Moreover, if Bucci testifies, the government may seek to offer evidence of this conviction pursuant to Fed.R.Evid. 609.

### F.     Recorded Conversations

As outlined above, the government intends to introduce a number of the recorded conversations.  The government has prepared transcripts of each of these recordings and will provide them to the defendants in advance of trial.  The government intends to provide the Court and each juror with a binder which includes all of the transcripts to assist the jurors in listening to the recordings.  In addition, the government will ask to have one copy of each transcript marked for identification and will request that one set of transcripts be provided to the jury during deliberations.  See generally United States v. Young, 105 F.3d 1, 10-11 (1st Cir. 1997)(approving use of transcripts to aid jurors in listening to recorded conversations).

### G.     Drug Quantity Instruction

As to be outlined in the government's proposed jury instructions,  Counts 1 and 2 of the Indictment allege that the crimes involve more than 500 grams of cocaine.  Because this quantity raises the statutory maximum penalty, the government requests that the jury make a drug quantity finding.  See Derman v. United States, 298 F.3d 34, 42 (1st Cir. 2002); Apprendi v. New Jersey, 530 U.S. 466 (2000); compare 21 U.S.C. §841(b)(1)(B)(forty year maximum) with 21 U.S.C. §841(b)(1)(C) (twenty year maximum).  Count 5, which charges Bucci with the cocaine recovered from his car upon his arrest also alleges the quantity of narcotics recovered.  However, because the quantity does not affect the statutory maximum penalty, the government is not requesting a jury finding on quantity.  See 21 U.S.C. §841(b)(1)(C); United States v. Mercado Irizarry, 404 F.3d 497, 503 (1st Cir. 2005)(default statutory maximum sentence of 20 years found in 21 U.S.C. §841(b)(1)(C)).

### H.     Preliminary Jury Instructions

As outlined in its proposed jury instructions, the government requests that in its opening instructions to the jury, the Court give a brief overview of the elements of each offense.

### I.     Forfeiture

In this criminal action, the United States seeks forfeiture of a 1997 Mercedes Benz S500, Vehicle Identification Number WDBGA51G1VA349608, seized from Defendant Bucci on or about May 20, 2004, on the grounds that it was used, or intended to be used, to facilitate the commission of his violations of 21 U.S.C. § 846 and 21 U.S.C. § 841.  The United States also seeks forfeiture of $6,563.00 in U.S. Currency seized from Defendant Bucci on or about May 20, 2004, on the grounds that it constitutes or is derived from proceeds he obtained as the result of his violations of

26

21 U.S.C. § 846 and 21 U.S.C. § 841, and that it was used, or intended to be used, to facilitate the commission of his violations of 21 U.S.C. § 846 and 21 U.S.C. § 841.

The applicable statute provides that the following property is subject to forfeiture to the United States:

> Any person convicted of a violation of this subchapter or subchapter II of this chapter punishable by imprisonment for more than one year shall forfeit to the United States, irrespective of any provision of state law ... (1) any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of such violation; (2) any of the person's property used, or intended to be used, in any manner or part, to facilitate the commission of, such violation; ...

21 U.S.C. § 853(a).

Pursuant to Fed. R. Crim. P. 32.2(b), the criminal trial must be bifurcated into guilt and forfeiture phases. The court must conduct a proceeding to determine the forfeitability of the property as soon as practicable after the court enters a guilty verdict. Fed. R. Crim. P. 32.2(b)(1). Generally, the forfeitability of the property is determined by the court, but in cases where the guilty verdict was returned by a jury, the defendant has the right to ask that the jury be retained to make the forfeitability determination. Fed. R. Crim. P. 32.2(b)(4); United States v. Davis, 177 F. Supp. 2d 470 (E.D. Va. 2001) (under Rule 32.2(b)(4), defendant must make a specific request to have the jury retained to determine the forfeiture).

The burden of proof regarding forfeitability of property in a criminal case is preponderance of the evidence. Libretti v. United States, 516 U.S. 29, 49 (1995) (forfeiture is part of the sentencing phase of a criminal case, and a defendant accordingly has no Sixth Amendment right to have the jury determine the forfeitability of his property); United States v. Rogers, 102 F.3d 641, 648 (1st Cir. 1996) (burden of proof in section 853 cases is preponderance of the evidence because criminal

27

forfeiture is part of the sentence under <u>Libretti</u>).  <u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000) does

not apply to the forfeiture phase of a criminal trial.  <u>United States v. Keene</u>, 341 F.3d 78, (1st Cir.

2003).  The forfeiture is not viewed as a separate charge, but as an aspect of punishment imposed

following conviction of a substantive offense.  <u>Id.</u> at 85-86 (internal quotations and citations

omitted).  Thus, the preponderance of the evidence standard applies.  <u>Id.</u> at 86.

      The court, or the jury at the defendant's request, must find whether there is a nexus between

the property that the government asserts shall be forfeited to the United States and each violation

of which it finds the defendant guilty.  The finder of fact may consider any evidence, including

testimony, offered by the parties at any time during the trial.  The finder of fact must not consider

what happens to any property that is declared forfeited, nor should it consider any claims that other

persons may have to the property.  The interests that other persons may have in the property will be

taken into account by the court at a later time.  Similarly, any claims that the forfeiture of the

property would constitute excessive punishment will be taken into account by the court at a later

time.

      Respectfully submitted,

      MICHAEL J. SULLIVAN
      United States Attorney

Date: March 6, 2006      By: *S. Theodore Merritt*
      S. THEODORE MERRITT
      JOHN T. MCNEIL
      Assistant U.S. Attorneys

## <u>CERTIFICATE OF SERVICE</u>

I, S. Theodore Merritt, Assistant United States Attorney, do hereby certify that this document, filed through ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and that paper copies will be sent to those indicated as non registered participants on this date.

By:     *S. Theodore Merritt*

S. THEODORE MERRITT
JOHN T. MCNEIL
Assistant U.S. Attorneys

29