04-10194

# United States Court of Appeals
## For the First Circuit

---

Nos. 06-2746, 07-1087

UNITED STATES OF AMERICA,

Appellee,

v.

ANTHONY BUCCI and DAVID A. JORDAN,

Defendants, Appellants.

---

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Reginald C. Lindsay, U.S. District Judge]

---

Before

Howard, Circuit Judge,
Stahl, Senior Circuit Judge,
and Besosa, District Judge.*

---

Robert L. Sheketoff and Anthony Bucci, pro se, for appellant Anthony Bucci.

Raymond J. Rigat for appellant David A. Jordan.

David A. Hollar, U.S. Department of Justice Criminal Division, with whom Michael J. Sullivan, United States Attorney, was on brief for appellee.

---

May 13, 2008

---

*Of the District of Puerto Rico, sitting by designation.

**STAHL**, **Senior Circuit Judge**. Defendant-appellant Anthony Bucci was convicted for conspiracy to distribute, and to possess with intent to distribute, over 500 grams of cocaine; possession with intent to distribute cocaine; and the use or carrying of a firearm during and in relation to a drug-trafficking crime. Defendant-appellant David A. Jordan was convicted of conspiracy to distribute, and to possess with intent to distribute, over 500 grams of cocaine; possession with intent to distribute cocaine; the use or carrying of a firearm during and in relation to a drug-trafficking crime; witness tampering; and three counts of making false statements to the Drug Enforcement Administration ("DEA").

## I. BACKGROUND

To the extent that these challenges involve the sufficiency of the evidence, "[w]e recite the pertinent facts in the light most favorable to the verdict." United States v. Downs-Moses, 329 F.3d 253, 257 (1st Cir. 2003). Jordan and Bucci's other challenges do not involve serious factual disputes or do not demand immediate resolution on direct appeal.

On July 6, 2004, a grand jury returned an eight-count indictment[1] against Bucci, Jordan, and Francis "Skeeter" Muolo.

---

[1]Count 1 charged the defendants with conspiracy to distribute, and to possess with intent to distribute, over 500 grams of cocaine in violation of 21 U.S.C. § 846. Count 2 charged them with possession with intent to distribute over 500 grams of cocaine pursuant to 21 U.S.C. § 841(a)(1). Count 3 charged them with using

Muolo pleaded guilty to the conspiracy and possession charges of the indictment pursuant to an agreement with the Government. As part of this agreement, Muolo agreed to provide testimony against Bucci and Jordan (although he was not, in fact, called to the stand). He was sentenced to fifty-seven months' imprisonment.

This case involves the robbery of a drug dealer by other drug dealers, including Bucci, and Jordan, a police officer. Jordan, a member of the Malden, Massachusetts, Police Department since 1985, became a narcotics detective during the mid-1990's. In 2003, Jordan renewed an old acquaintance with an individual named Jon Minotti, a former corrections officer who worked in real estate and as a plasterer. At some time during their renewed relationship, Jordan began to purchase marijuana from Minotti, who dealt drugs to support his own habit. Jordan expressed anger to Minotti regarding the amount of money that cocaine dealers earned through their illicit trade.

Sometime during 2003, Minotti informed Bucci, another old acquaintance for whom he had recently performed plastering work,[2]

---

or carrying a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 9214(c)(1)(A). Count 4 charged Jordan with witness tampering, in violation of 18 U.S.C. § 1512(b)(3). Count 5 charged Bucci with another count of possession with intent to distribute cocaine. Finally, Counts 6 through 8 charged Jordan with making false statements to the DEA, in violation of 18 U.S.C. § 1001.

[2] Minotti and Bucci also engaged in several unrelated drug transactions. The district court, however, excluded evidence regarding these deals as unduly prejudicial. Thus, we will not

of his friendship with Jordan. Also during 2003, Minotti met yet another drug dealer, Carlos Ruiz,[3] from whom he periodically purchased ounce quantities of cocaine. Minotti introduced Bucci to Ruiz later that year, but told Ruiz that Bucci's name was "Gino."

In late November or early December 2003, while at the apartment of a friend, Bryan Raftery,[4] Bucci informed Minotti that he wanted to rob Ruiz, with whom he was angry. Bucci devised a plan in which Jordan would arrive to "bust" a drug deal between Minotti and Ruiz, allowing Minotti to escape with the drugs. Muolo, another friend of Minotti, was recruited as Minotti's getaway driver. Minotti relayed the proposal to Jordan, who initially expressed some reluctance at participating.

Undeterred by Jordan's lack of enthusiasm for the scheme, Bucci proceeded with alacrity. A few days before Christmas, Bucci directed Minotti to order three kilograms of cocaine from Ruiz on

---

consider them in our review.

[3]Ruiz pleaded guilty to a separate indictment. He received substantial sentence reductions in exchange for his testimony against Bucci and Jordan. Additionally, he received safety valve treatment for which he almost certainly would not have been eligible had the government disclosed information, adduced in this case, to the sentencing court concerning numerous threats Ruiz made against Minotti. The jury, of course, was entitled to credit Ruiz's testimony, which was mostly corroborated by reliable evidence, despite these inducements.

[4]Raftery, despite a grant of immunity, refused to testify at the defendants' trial and was held in civil contempt. He subsequently pleaded guilty to criminal contempt and was sentenced to probation.

his behalf. On December 23, after some negotiations, Minotti and Ruiz settled on a price of either $27,000.00 or $28,000.00 per kilogram and agreed to meet at Minotti's house at 10:00 a.m. the next day to complete the transaction. With time running short, Minotti again solicited Jordan's help. Jordan, although still ambivalent, proposed that everyone involved in the prospective robbery meet in the parking lot of the Malden Medical Center the next day.

Around 8:30 a.m. on December 24, Bucci, in his black S500 Mercedes Benz, license plate number 3802YL, drove to Minotti's house. Muolo apparently arrived separately. From there, Bucci, Minotti, and Muolo drove in Minotti's vehicle, a black Chevrolet Avalanche, to the Medical Center. There, they met Jordan, who was driving an unmarked police car, a tan Honda. Despite some lingering reservations, he agreed to participate in the scheme in exchange for $30,000.00. Jordan suggested that Minotti "escape" with the stolen drugs through a strip of woods adjacent to the Medical Center. From there, Minotti could reach a nearby street, where Muolo would pick him up. Bucci proposed that Jordan call for back-up to make the bust appear more realistic, but Jordan demurred.

Unbeknownst to the conspirators, the DEA had tapped Ruiz's phone as part of an ongoing, mostly unrelated narcotics investigation. Around December 20, 2003, the DEA intercepted

communications between Ruiz and Minotti regarding the proposed transaction. In response, the DEA set up roving surveillance outside Minotti's residence, commencing at approximately 9:00 a.m. on December 24. At 9:10 a.m., DEA Agent Jean Drouin and Massachusetts State Police Sergeant Thomas Quin observed a black Mercedes parked in the driveway with license plate number 3802YL, but noted that Minotti's black Chevrolet Avalanche was absent. When the agents returned at 9:42 a.m., the Mercedes was gone, but Minotti's Avalanche had returned.

At 9:55 a.m., Ruiz arrived in a maroon Buick Park Avenue. Ruiz and Minotti left the house together in Ruiz's car to travel to the Medical Center. After a few seconds, however, Minotti instructed Ruiz to turn around, under the pretense that he had forgotten his cell phone. In reality, Minotti was experiencing doubts about the wisdom of robbing Ruiz. Leaving Ruiz in the car, Minotti called Bucci to express these concerns. Minotti told Bucci that the deal would not work anyway, falsely explaining that Ruiz wanted to be paid before relinquishing physical possession of the cocaine. Bucci instructed Minotti to hand over the phone to Ruiz. After a conversation between the two, which Minotti overheard, Ruiz agreed to bring all of the cocaine to the parking lot of the Medical Center, to permit Bucci an opportunity to test its quality.

When Minotti and Ruiz arrived at the Medical Center they pulled alongside Bucci's vehicle, which was positioned against a

rail, facing outward to the parking lot. Minotti exited the car, taking with him all three kilograms of cocaine. After observing Jordan's car entering the parking lot, perhaps twenty or third yards distant, Minotti immediately fled down an embankment into the woods carrying the three kilograms with him.

Jordan positioned his car directly behind Ruiz's Buick, blocking Ruiz (but not Bucci) from escape. Jordan, in plain clothes, exited the car, shouted "Malden Police," and pointed a gun at Ruiz. Jordan ordered both Ruiz and Bucci from their vehicles and frisked both men. Jordan searched Ruiz's car, examined his license, and performed a warrant check. He did not, however, perform any similar investigation of Bucci. Jordan then informed Ruiz, "It's your lucky day. I'm going to let you go. You have a merry Christmas." Ruiz returned to his car and left the parking lot. Jordan departed the parking lot as well, driving directly past Agent Drouin and Sergeant Quin's surveillance location. Bucci left his car and entered the Medical Center. A few minutes later, Jordan returned to the parking lot and drove to the entrance of the Medical Center. Bucci exited the Medical Center, and the two men had a brief conversation before going their separate ways.

Muolo and Minotti took the cocaine to Muolo's apartment in Stoneham. Once Bucci arrived, the conspirators opened one of the bags of cocaine. Taking the cocaine, Bucci indicated that he planned to sell it and split the proceeds with the others. Because

Jordan was impatient to receive his share of the money, Bucci, Minotti, and Muolo decided to give him whatever cash was available by the end of the night.

Later that afternoon, Ruiz and his brother-in-law, Armando Lovos, arrived at Minotti's house in a blue SUV. Ruiz suspected that the drug bust had been a setup, did not believe that Jordan was a real police officer, and was unsurprisingly furious with Minotti. Ruiz demanded that the cocaine be returned immediately. Minotti replied that he had abandoned the drugs in the woods and refused to return to search for them, ostensibly for fear that the police would be there. Still unsatisfied, Ruiz nevertheless left to search for the cocaine in the woods near the Medical Center. After Ruiz's departure, Minotti called Bucci to inform him of Ruiz's visit. Bucci suggested to Minotti that Jordan should confront Ruiz at the Medical Center to demonstrate his legitimacy. Minotti communicated this suggestion to Jordan, who agreed to look for Ruiz at the Medical Center.

At the Medical Center, Jordan encountered Ruiz and Lovos. Jordan took Lovos's identification, but did not run a warrant check. Instead, he simply instructed Ruiz and Lovos to leave the area. Recordings from the DEA's wire on Ruiz substantiate that Ruiz was convinced he had been ripped off and that he knew Jordan was not an honest policeman. In fact, Jordan's appearance only reinforced Ruiz's suspicions, as he rightly inferred that one of

the conspirators had tipped Jordan off that Ruiz and Lovos were returning to the Medical Center to search for the supposedly abandoned cocaine.

At about 10:15 p.m., Minotti received a voicemail from Bucci indicating that he had left money in a "blue tub" outside Minotti's back door. After finding the money, Minotti took $5,000.00 for himself to satisfy an unrelated debt and delivered the remainder to Jordan at his home. Jordan later complained that the black bag contained only $15,000.00 and demanded the rest of his payment. Bucci, again via Minotti, promised Jordan that he would receive the rest of his payment once Bucci was able to sell the cocaine.

On December 26, Jordan stopped by Minotti's house to make sure Minotti was unharmed, that Ruiz had not returned, and to ascertain when he would receive the rest of his money. Jordan instructed Minotti that, if questioned, he should tell law enforcement officers that he had been acting as an informant for Jordan in an attempt to catch Ruiz dealing drugs. Just then, Ruiz appeared at Minotti's home, accompanied by four or five henchmen. Jordan left, covering his face in an unsuccessful bid to avoid recognition.

Ruiz suggested that Minotti should get in the car with him. Under the pretext of getting his coat, Minotti returned inside to call Jordan for help. Jordan suggested that Minotti call

the police and complain about Ruiz trespassing, which Minotti did. When the police arrived, Minotti informed them of his ostensible role as Jordan's informant. The police instructed Ruiz, who eventually admitted to them that he was there to collect a drug debt, to leave.

At that point, Jordan apparently began to regret his role in the scheme. At 1:30 p.m. on December 26, Jordan called Agent Drouin to inquire whether Ruiz was under investigation. During this conversation, Jordan asked whether the DEA had attempted any surveillance of Ruiz on December 24. Because Agent Drouin already suspected Jordan of illegal activity, he told him that, while Ruiz was a target, no operation had taken place on that particular day. In an apparent effort to cover his tracks, Jordan informed Agent Drouin of certain, carefully-selected details regarding the drug rip-off at the Medical Center. Several of these details, however, were false.

Next, Jordan contacted Minotti and suggested that they return the cocaine to Ruiz or pay him for it. Minotti communicated to Bucci Jordan's desire to undo the robbery. Bucci responded that this rescission would be "stupid" and dangerous, as he believed trying to rescind the robbery would confirm Ruiz's suspicions about the rip-off, compounding their problems. At a meeting in Stoneham, Jordan returned a portion of his ill-gotten funds to Minotti, and instructed him to give the money to Ruiz. Despite his reluctance,

Bucci agreed to surrender his share of the proceeds to Minotti. As Bucci and Minotti attempted to gather the rest of the cocaine, they received two frantic messages from Muolo indicating that something bad had happened. When they arrived at Muolo's apartment, he informed them that he had flushed the cocaine down the toilet.[5] Minotti went home, took $2,000.00 of his wife's money, and met Ruiz at the Saugus mall to compensate him for the stolen cocaine.

In early May 2004, DEA agents arrested Ruiz. Although Ruiz refused to cooperate fully against his suppliers in Mexico, he agreed to provide information regarding the drug rip-off. He picked Minotti and Bucci out of a lineup. Before Ruiz agreed to cooperate, Agent Drouin called Jordan to inform him of Ruiz's arrest, but Jordan expressed very little interest.

On May 19, 2004, Minotti encountered Muolo, supposedly by chance, at a Dunkin' Donuts. Muolo told Minotti that the police had asked him to cooperate against Minotti. He warned Minotti not to answer the phone if he called and asked to meet at a baseball field at 3:00 p.m. Minotti relayed this information to Jordan, who instructed Minotti to tell Muolo to "keep his mouth shut" and indicated that he did not want to talk to Minotti anymore. While Minotti waited for Muolo at their designated meeting place, DEA

[5] Later, Muolo informed Minotti that he had, in fact, given the cocaine to Bucci and lied to the others at Bucci's request.

Agent Mark Tully and Sergeant Quin approached Minotti, who agreed to cooperate by wearing a body wire to a meeting with Jordan.

Minotti arranged to meet Jordan at a skating rink in Malden. Although Jordan did not directly inculpate himself, he made a plethora of highly suspicious statements that strongly suggested that he was part of an unlawful conspiracy of some sort with Minotti, Bucci, and Muolo. The next day, May 20, Jordan attempted to speak with Minotti at his home, but Minotti refused to answer the door. Later, however, at Sergeant Quin's request, Minotti placed a recorded call to Jordan. During the call, Jordan expressed further concern about Muolo, directing Minotti to tell Muolo "not to give the bid out."

That same day, Agent Tully arrested Jordan. Agent Drouin, supported by several other officers, arrested Bucci outside of his wife's tanning salon in Malden as he attempted to enter his black Mercedes. After being informed of his rights, Bucci smugly taunted the officers, "You didn't get me on any phones." Eventually, Bucci's black Mercedes was seized and its contents were inventoried. Of particular interest, the vehicle contained ninety-one grams of cocaine dispersed in three separate plastic baggies that were contained within one larger bag; two digital scales; $6,653.00 in cash; four mobile phones and six separate SIM cards[6];

[6]A SIM, or "security identity module," card is the device within a phone that contains the unique information identifying a particular subscriber.

and a pager. Officer Jamie Cepero, a Massachusetts state trooper assigned to the DEA task force, offered expert testimony regarding the contents of Bucci's black Mercedes. He testified that the above-mentioned items were probative of drug trafficking. Officer Cepero opined that the quantity of drugs found in Bucci's car, ninety-one grams, is inconsistent with mere personal use. Cepero also testified that the contents of Bucci's car lacked indicia of personal use, such as straws, mirrors, and razor blades.

On April 12, 2006, following a trial, a jury returned a verdict of guilty against both Bucci and Jordan on all counts of the indictment. On November 15, 2006, the district court sentenced Bucci to a term of 252 months' imprisonment and Jordan to a term of 180 months' imprisonment. The defendants filed timely notices of appeal.

## II. ANALYSIS

### A. Bucci[7]

#### 1. Ineffective Assistance

Bucci contends that his trial counsel's performance was so deficient as to violate the Sixth Amendment and require reversal of his convictions. "We have held with a regularity bordering on the monotonous that fact-specific claims of ineffective assistance cannot make their debut on direct review of criminal convictions, but, rather, must originally be presented to, and acted upon by, the trial court." United States v. Leahy, 473 F.3d 401, 410 (1st Cir. 2007) (quoting United States v. Mala, 7 F.3d 1058, 1063 (1st Cir. 1993) (internal quotation marks omitted)). Nevertheless, in an exceptional case, the record may be adequately developed to permit meaningful review. Id. In this instance, however, we are unable to draw any reasoned conclusions from the cold record.

Bucci makes several fact-intensive complaints regarding his trial counsel's purportedly deficient performance. First, he asserts that trial counsel, in his opening argument, promised to

---

[7]Bucci has filed four pro se motions that remain pending. We deny Bucci's motion to supplement the record (Docket No. 102) and his motion to correct the trial transcript (Docket No. 152). These matters are better addressed by the district court on a petition for collateral review. We grant Bucci's second motion to supplement the record (Docket No. 128), given that the document in question has already been made a part of the record by the district court. It is not, however, pertinent to any issue pending before us. Finally, we deny Bucci's motion to file a supplemental reply brief (Docket No. 155). We require no further elaboration of his claims of error.

the jury that he would present an alibi witness, Lisa Murphy, who would testify that Bucci's activities on December 24 were inconsistent with the Government's theory of the case. Second, Bucci complains that trial counsel addressed the prospective testimony of Muolo during his opening statement, despite the fact that the Government did not indicate an intention to call Muolo during its own opening statement. Third, Bucci contends that trial counsel rendered deficient performance by failing to lay the foundation for and offer the testimony of Ross Minnoti, Jon Minotti's brother, who was purportedly willing to testify that Jon Minotti informed him that Bucci was innocent, and that he was only implicating Bucci to save his own skin. These three issues are best left for a collateral proceeding where Bucci will have the opportunity to develop the record to explicate his claim.

Lastly, we address trial counsel's closing argument. During closing, trial counsel was twice admonished for making improper remarks. First, trial counsel asked rhetorically, "If Br[y]an Raftery made those calls for Anthony Bucci, why didn't he come in here and tell you about them?" Following an objection by the Government, the district court gave a forceful limiting instruction, informing the jury that trial counsel's remarks were improper and that "the government had intended to call Mr. Raftery and he, Mr. Raftery, refused to testify. He is absent in this case because he refuses to be present." Later, trial counsel accused

the Government of knowingly and deliberately presenting perjured testimony. Again, the district court instructed the jury that trial counsel's actions were improper.

Undoubtedly, the limiting instructions issued by the district judge in response to trial counsel's remarks did little to advance Bucci's cause before the jury. At the same time, these events do not independently give rise to sufficient prejudice to merit reversal of Bucci's convictions. At worst, they may have cost Bucci some of the good will of the jury. The evidence against Bucci was overwhelming, and trial counsel's comments and the corresponding limiting instructions did nothing to add to the mountain of inculpatory evidence arrayed against him. Federal agents observed Bucci's vehicle at Minotti's house the morning of the rip-off; Bucci was observed by federal agents at the scene of the crime, parked alongside Ruiz; the agents observed Bucci speaking with Jordan outside the Medical Center immediately after the rip-off; and cocaine, two digital scales, $6,653.00 in cash, four mobile phones and six separate SIM cards, and a pager were found in Bucci's vehicle upon his arrest. Finally, of course, Minotti's and, to a lesser extent, Ruiz's testimony directly implicated Bucci in the crime.

2. <u>Matters Related to Severance</u>

Bucci argues that the district court erred by denying his motion to sever. At issue is Exhibit 24, a recording of a May 19,

2004, conversation between Bucci's codefendant, Jordan, and Minotti, in which Bucci's name is mentioned. The recording was properly introduced against Jordan as an admission. The district court ruled, however, that Jordan's statements were inadmissible hearsay in relation to Bucci. The district court denied Bucci's pretrial motion to sever as well as his trial motion to redact his name from the statements. To protect Bucci from unfair prejudice, the district court, on two separate occasions, instructed the jury that the statements were not admissible against Bucci. Bucci concedes that his Confrontation Clause rights were not violated because Jordan testified in his own defense at trial. California v. Green, 399 U.S. 149, 164 (1970) (holding that "the Confrontation Clause does not require excluding from evidence the prior statements of a witness who concedes making those statements"). Thus, the issue at hand is one of evidence rather than constitutional law.

We "review the denial of a motion to sever only for a manifest abuse of discretion." United States v. Page, ___ F.3d ___, ___, 2008 WL 820741, at *6 (1st Cir. Mar. 28, 2008). "[S]everance is particularly difficult to obtain where, as here, multiple defendants share a single indictment." Id. (quoting United States v. Casas, 425 F.3d 23, 37 (1st Cir. 2005) (internal quotation marks omitted)). To merit reversal on the basis of a district court's denial of severance, a "defendant must show