'prejudice so pervasive that a miscarriage of justice looms.'" United States v. Turner, 501 F.3d 59, 73 (1st Cir. 2007) (quoting United States v. LiCausi, 167 F.3d 36, 49 (1st Cir. 1999)). "[S]everance is particularly disfavored in conspiracy cases." Id.

As a general matter, we cannot say that the district court abused its wide discretion in refusing to grant separate trials at the outset of the proceedings. Our jurisprudence favors trying co-conspirators together, despite the reality that evidence admissible against one defendant may be, and often is, inadmissible with regard to others. See, e.g., id. We see no unusual circumstances that should have tilted the balance in favor of severance in this particular case.

Second, we address Bucci's contention that the district court committed reversible error by issuing a limiting instruction rather than redacting Bucci's name from the recording and the transcript provided to the jury. Even where the Confrontation Clause is implicated, we ordinarily presume that jurors will follow limiting instructions. United States v. Rodríguez-Durán, 507 F.3d 749, 769 (1st Cir. 2007). Occasionally, however, at least in the constitutional context, a limiting instruction will not be sufficient to preserve a co-defendant's rights where the extrajudicial statement is "powerfully incriminating" and "'inculpatory on its face.'" Id. (quoting United States v. Vega Molina, 407 F.3d 511, 520 (1st Cir. 2005)). "Statements that are

incriminating only when linked to other evidence in the case" do not merit such scrutiny. Id. (quoting Vega Molina, 407 F.3d at 520) (internal quotation marks omitted).

The district court determined that Jordan's remarks, while powerfully incriminating as to Jordan, did not directly inculpate Bucci. Significantly, defense counsel candidly and explicitly agreed with this assessment while arguing Bucci's motion to sever. To be sure, Jordan's remarks were neither flattering nor helpful to Bucci's defense. The recording contains numerous derisive references to Bucci as well as a discussion concerning whether Bucci had been arrested and whether he was providing information to law enforcement. Thus, the recording surely implies that Bucci participated with Jordan and Minotti in an illicit undertaking of some species. Nevertheless, we cannot say that the district court erred by refusing to redact the recording to exclude Bucci's name. In light of our presumption that jurors follow limiting instructions such as those given here, the absence of constitutional error, and the inferential nature by which Jordan's statements link Bucci to the charged conduct, we find no abuse of discretion. Moreover, any error was clearly harmless given the substantial evidence of guilt as described above.[8]

---

[8]Indeed, to the extent that Bucci claims that Jordan's statements were prejudicial because they were derogatory, we note that Bucci's own theory of the case rested on the premise that he was a drug addict rather than a drug dealer.

-19-

Finally, Bucci asserts that the prosecutor's closing remarks made it impossible for the jurors to follow the district court's limiting instruction. See Vega Molina, 407 F.3d at 522 (reversing conviction where prosecutor implored jury to infer defendant's guilt from codefendant's redacted confession). Because he failed to object at trial, we review this aspect of his challenge only for plain error. Rodríguez-Durán, 507 F.3d at 770-71. In large part, references to the May 19 conversation were restricted entirely to the prosecutor's discussion of Jordan. Neither the prosecutor nor the court were required to remind the jurors by rote, in each instance the recording was mentioned, that the recording was not admissible against Bucci. We think that the district court's two separate admonitions that the jurors should not consider the May 19 recording as evidence against Bucci were sufficient to prevent confusion.

Bucci argues that the prosecutor's final summation, when he called for a guilty verdict against both defendants, was improper. Following a brief discussion of Bucci's culpability, the prosecutor stated:

> David Jordan, ladies and gentleman, at every step of this case . . . David Jordan chose to stand on the side of the criminal instead of the side of law enforcement. On December 24th at the Malden Medical Center parking lot, on December 26th when he was not protecting Jon Minotti and his family from the men who showed up at his home, in each of the calls with Agent Drouin, and on . . . May 19 as well.

-20-

> Ladies and gentleman, the most compelling testimony in this case, the most compelling word in this case didn't come from Jon Minotti. The most persuasive testimony in this case didn't come from Carloz Ruiz. It didn't even come from the agents [who] testified in this case. Ladies and gentlemen, the most persuasive, the most compelling, and the most damning words in this case came from David Jordan's own mouth, both on that tape and when he got up on that witness stand and he lied to you.
>
> Ladies and gentleman, I ask you to find both of these men guilty beyond a reasonable doubt of all the counts.
>
> Thank you.

It is readily apparent, in context, that the discussion of the recording concerned Jordan alone. The prosecutor had already summed up his case regarding Bucci before discussing Jordan for the final time. By contrast, in Vega Molina, a case upon which Bucci relies, the prosecutor explicitly requested the jury to convict the defendant based on the co-defendant's out-of-court confession, over the objection of the defendant and without a limiting instruction. 407 F.3d at 522. In Richardson v. Marsh, 481 U.S. 200 (1987), to which Bucci also cites, the prosecutor argued that information gleaned from a codefendant's confession supported an inference of guilt. See id. at 205 & n.2. Here, the facts fall well short of showing such prejudicial conduct.

Finally, to the extent they did invite confusion, we see very little prejudice in the prosecutor's remarks. As detailed above, the evidence against Bucci was daunting and his theory of

innocence scarcely credible. Moreover, the recording was not highly incriminating of Bucci. While it suggested that Jordan did not consider him to be an exemplary citizen, the jury already knew that from the contents of his black Mercedes. Thus, the prosecutor's comments during closing argument do not warrant reversal of Bucci's convictions.

3. Courtroom Closures

In a separate pro se brief, Bucci maintains that reversal of his convictions is necessary because the district court committed structural error by closing the courtroom to the public on two occasions. Because Bucci failed to object at trial, we review only for plain error. See United States v. Thomas, Nos. 98-1051, 98-1052, 98-1116, 2000 WL 236481, at *2 (2d Cir. Feb. 14, 2000) (unpublished summary disposition) (applying plain error analysis to purported violation of defendant's right to public trial).

The Sixth Amendment guarantees criminal defendants the right to a public trial. Waller v. Georgia, 467 U.S. 39, 46 (1984); Owens v. United States, 483 F.3d 48, 61 (1st Cir. 2007). Bucci argues that the district court erred by closing the courtroom during jury selection and later during a contempt proceeding against Raftery. We decline to address his challenge to the purported closure during jury selection at this time because it is not yet ripe. Although Bucci has attempted to submit additional

-22-

evidence to supplement the Spartan record, it remains inadequate to permit meaningful review. Bucci will have an opportunity, if he so chooses, to present this argument in a petition for collateral relief before the district court. At that point, the district court may hold an evidentiary hearing to test the merits of Bucci's claim. See id. at 66.

Bucci also argues that the district court erred by closing the courtroom during the contempt proceeding against Raftery. During this hearing, the Government called its next prospective witness, Raftery, to the stand. As expected, Raftery refused to testify, despite a grant of immunity. He indicated that he was concerned about potential perjury charges due to conflicts between his anticipated testimony and the statements he made before the grand jury and federal agents. The district court placed Raftery in civil contempt and warned him of the possibility that criminal contempt charges might be filed against him should he not testify. Despite these remonstrations, Raftery persisted in his refusal to testify. At the end of the hearing, the district court ordered that Raftery be taken into immediate custody.

Bucci's argument is flawed in two ways. First, the Sixth Amendment's requirement that a trial be public does not apply with its usual force to criminal contempt proceedings. See Levine v. United States, 362 U.S. 610, 616 (1960). Here, the district court specifically indicated that Raftery would be set free if he agreed

to testify. Thus, the contempt order was civil, not criminal, in nature. See Int'l Union, United Mine Workers of Am. v. Bagwell, 512 U.S. 821, 827-28 (1994). Civil contempt proceedings are not governed by the Sixth Amendment and require fewer procedural protections. See United States v. Winter, 70 F.3d 655, 661 (1st Cir. 1995) (stating that "a court may impose civil contempt sanctions pursuant to . . . minimal procedures" but that "criminal contempt sanctions may be imposed only if the court provides certain constitutional protections"); accord Santibáñez v. Weir McMahon & Co., 105 F.3d 234, 242-43 (5th Cir. 1997) (holding that protections of Sixth Amendment do not apply to civil contempt proceedings); Northeast Women's Ctr., Inc. v. McMonagle, 939 F.2d 57, 68-69 (3d Cir. 1991) (explaining that "arguments predicated on the Sixth Amendment are inapposite" to civil contempt proceeding); In re Di Bella, 518 F.2d 955, 958 (2nd Cir. 1975) (rejecting challenge to courtroom closure in civil contempt context). Consequently, not even Raftery himself, much less Bucci, could have invoked the Sixth Amendment right to a public trial during the civil contempt hearing.

Second, the contempt proceeding against Raftery was almost entirely collateral to Bucci's own trial and, thus, any closure did not infringe Bucci's Sixth Amendment right. See Petito v. Artuz, 69 F. App'x 26, 28 (2d Cir. 2003) (unpublished summary disposition) (rejecting defendant's Fifth Amendment challenge to

-24-

court's decision to exclude him from contempt proceeding against recalcitrant witness); United States v. Melchor Moreno, 536 F.2d 1042, 1047 n.7 (5th Cir. 1976) (explaining that "[t]he usual Sixth Amendment rights of cross-examination were only peripherally at stake here, since the hearing did not relate to guilt but to the collateral issue of whether [a witness's Fifth Amendment] privilege was properly invoked"); see also Brown v. Kuhlmann, 142 F.3d 529, 541 (2d Cir. 1998) (holding that courtroom closure during trial itself did not infringe defendant's Sixth Amendment rights where it involved cumulative testimony related to matter collateral to charged offense); United States v. Gallagher, 576 F.2d 1028, 1040 (3d Cir. 1978) (finding no error where trial judge cleared courtroom, not excepting even attorneys, to explore possible self-incrimination issues related to witness).

    During this particular closure, no evidence was presented against either defendant; the defendants and their counsel were permitted to remain; and the courtroom was promptly reopened at the conclusion of the contempt proceeding. In the end, the temporal proximity and causal relationship between Bucci's criminal trial and the civil contempt hearing against Raftery did not necessarily render the two proceedings one and the same. Although Bucci undoubtedly enjoyed a right to compulsory process under the Sixth Amendment to call Raftery as a witness, he lacked any converse right to prevent him from testifying. Put differently, he had no

cognizable constitutional interest under the Sixth Amendment in Raftery's refusal to testify when called by the Government. Thus, although it would have been better practice for the trial judge to have made specific record findings justifying his decision to close the courtroom, see Waller, 467 U.S. at 44-47, on these facts and under a plain error standard of review, Bucci suffered no constitutional deprivation.

4. Constructive Amendment of the Indictment and Alleged Variances

Bucci argues in his pro se brief that the district court erred by permitting a constructive amendment of the indictment. Constructive amendments are forbidden by the Fifth Amendment, which guarantees defendants the right to be tried only on charges indicted by a grand jury. U.S. Const. amend V; United States v. Fornia-Castillo, 408 F.3d 52, 66 (1st Cir. 2005). "A constructive amendment is considered prejudicial per se and grounds for reversal of a conviction." United States v. DeCicco, 439 F.3d 36, 43 (1st Cir. 2006). To determine whether a constructive amendment has occurred, we examine whether the terms of the indictment were "altered, either literally or in effect, by prosecution or court after the grand jury has last passed upon them." Id. (quoting United States v. Fisher, 3 F.3d 456, 462 (1st Cir. 1993) (internal quotation marks omitted)). Our review is de novo. United States v. Hernandez, 490 F.3d 81, 83 (1st Cir. 2007).

Bucci also alleges two different but related variances between the indictment and the evidence adduced against him at trial. "A variance arises when the proof at trial depicts a scenario that differs materially from the scenario limned in the indictment." United States v. Cianci, 378 F.3d 71, 94 (1st Cir. 2004) (quoting United States v. Villarman-Oviedo, 325 F.3d 1, 12 (1st Cir. 2003) (internal quotation marks omitted)). A variance mandates reversal only where it is both material and prejudicial. Id.

In his brief, Bucci conflates his constructive amendment argument with his variance claim. Rather than engage in a futile endeavor to parse the two, we address them simultaneously. His underlying challenge lacks merit under either theory. First, Bucci asserts that while the indictment alleged a conspiracy to distribute cocaine, the evidence at trial supported only a conspiracy to commit robbery. Second, Bucci contends that the indictment was faulty because it failed to allege a Hobbs Act conspiracy. Bucci asserts that this failure prejudiced him because some of the jurors may have relied upon the drug rip-off to convict Bucci of conspiracy to distribute cocaine.

Bucci's challenges appear to rest upon two faulty premises. First, while it is possible that the evidence could have supported other charges, a grand jury is under no obligation to indict every conceivable crime potentially implicated by a

-27-

defendant's conduct. The possible Hobbs Act violation Bucci describes is not mutually exclusive with the charges contained within the indictment. Second, Bucci's argument consists of little more than utter speculation that the jury disregarded its instructions by convicting him of an uncharged offense. Given the substantial evidence indicating that Bucci did, in fact, conspire to possess and distribute cocaine, we cannot infer that any jurors decided that Bucci did not conspire to possess and distribute cocaine, but convicted him of that offense, heedless of the law, on the basis that he conspired to commit robbery. He has utterly failed to demonstrate either a constructive amendment of the indictment or a variance between the indictment and the evidence adduced at trial. He cannot obtain relief on the counterintuitive theory that the jury could have convicted him of other, additional crimes that were neither charged nor detailed in the jury instructions.

5. The Firearm Count

Next, in his pro se brief Bucci argues that the Government failed to introduce sufficient evidence for a properly instructed jury to convict him of Count 3 of the indictment, possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c). We review claims related to the sufficiency of the evidence de novo. United States v. De La Cruz, 514 F.3d 121, 141 (1st Cir. 2008).

"The basic elements of a § 924(c)[] violation are '(1) that the defendant committed the predicate drug trafficking crime . . .; (2) that the defendant knowingly carried or used a firearm; and (3) that the defendant did so during and in relation to the specified predicate offense.'" United States v. Flecha-Maldonado, 373 F.3d 170, 179 (1st Cir. 2004) (quoting United States v. Figueroa-Encarnacion, 343 F.3d 23, 30 (1st Cir. 2003) (alteration in original)). However, any particular defendant need not have physically carried the gun for liability to attach. See id. Rather, under Pinkerton v. United States, 328 U.S. 640 (1946), the Government may show "that a co-conspirator carried or used a firearm in furtherance of the conspiracy and that this was reasonably foreseeable to the defendant." Flecha-Maldonado, 373 F.3d at 179.

At trial, the Government relied on the theory that it was reasonably foreseeable to Bucci that Jordan would utilize a firearm during the drug rip-off. Bucci cites to United States v. Medina-Roman, 376 F.3d 1 (1st Cir. 2004), for the proposition that the government was required to prove that Bucci knew "to a practical certainty" that Jordan would carry or use a firearm in furtherance of the conspiracy. Id. at 5-6. Such reliance is mistaken. In Medina-Roman, the defendant was not notified of potential Pinkerton liability during her guilty plea and, thus, the Government was held to the higher standard associated with aiding and abetting.

-29-

Medina-Roman, 376 F.3d at 3 n.4, 6. Here, the district court properly instructed the jury concerning Pinkerton liability. See United States v. Sanchez, 917 F.2d 607, 612 (1st Cir. 1990) (holding that a "district court may give a Pinkerton charge even though the indictment does not plead vicarious liability"). There was ample evidence for the jury to conclude that Jordan's use of the firearm was reasonably foreseeable to Bucci.

Bucci's ancillary argument, that the Government failed to prove a conspiracy to commit a drug trafficking offense, is equally mistaken. The Government adduced sufficient evidence to convict Bucci of just such a conspiracy.

6. The Jury Instructions

Next, Bucci contends in his pro se brief that the jury instructions were erroneous because they presented the jury with an unfair Hobson's choice. He reasons that the instructions precluded the jury from finding Bucci not guilty of Count 3 because they provided for conviction based on either reasonable foreseeability or actual knowledge. This argument is absurd as a matter of basic logic. The jury could, of course, have found Bucci not guilty of Count 3 if it either (a) rejected the government's evidence of conspiracy or (b) determined that Jordan's use of the firearm in furtherance of the conspiracy was not reasonably foreseeable and that Bucci had no actual knowledge that it would be used. It is permissible for the government to present evidence of guilt tending

-30-

to demonstrate both actual and constructive knowledge. See United States v. Griffin, Nos. 07-1475, 07-1477, ___ F.3d ___, ___, 2008 WL 1759161, at *5 (1st Cir. Apr. 18, 2008) (affirming conviction based on evidence of actual knowledge and willful blindness in tax evasion prosecution).

7. *Booker* Error

Finally, Bucci argues in his pro se brief that the district court's application of the Sentencing Guidelines violated the Sixth Amendment. See United States v. Booker, 543 U.S. 220 (2005). As an initial matter, we categorically reject Bucci's argument that the remedial Booker opinion was only a temporary fix subject to an expiration date. While the remedial majority may have invited Congress to take independent action, see id. at 265, it contains no indication of eventual constitutional infirmity in the absence of a Congressional mandate. More specifically, we have held that Booker requires reversal only where judicial fact-finding increases the statutory maximum penalty. United States v. Antonakopoulos, 399 F.3d 68, 79 (1st Cir. 2005). The 168 month sentence Bucci received for drug trafficking and the 84 month sentence he received for the weapons charge were both near the low end of the guidelines' ranges, far below the statutory maximums. Thus, Bucci's claim of Booker error is without merit.

B. **Jordan**[9]

Jordan contends that the district court erred by permitting the Government to redact portions of the recording and transcript of a December 24, 2003, conversation between Ruiz and Minotti. At trial, Jordan requested that the redacted materials be included pursuant to Rule 106 of the Federal Rule of Evidence for purposes of impeachment.

Jordan concedes that the rule against hearsay would have prevented him from independently offering these statements for substantive purposes. Rule 106, which codifies the common law doctrine of completeness, provides that

> When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.

Fed. R. Evid. 106. We review a district court's rulings concerning Rule 106 for abuse of discretion. United States v. Millan, 230 F.3d 431, 434-35 (1st Cir. 2000). A defendant must show prejudice in order to obtain relief. See United States v. Awon, 135 F.3d 96,

---

[9] Jordan argues that the district court erred by determining that he was subject to a mandatory minimum on the weapons charge because he brandished the firearm during the drug rip-off. He contends that brandishing a firearm is an element of the offense and, therefore, the government was obligated to prove this fact to a jury in light of Booker. He acknowledges, however, that this challenge is foreclosed by our decision in United States v. Lizardo, 445 F.3d 73, 89-90 (1st Cir. 2006), and urges it merely to preserve his rights for further review.

101-02 (1st Cir. 1998), <u>abrogated on other grounds by</u> <u>United States</u> v. <u>Piper</u>, 298 F.3d 47, 57 n.5 (1st Cir. 2002).

Peculiarly, the Government maintains that the purview of Rule 106 is limited to the order of proof. To the contrary, our case law unambiguously establishes that the rule of completeness may be invoked to facilitate the introduction of otherwise inadmissible evidence. <u>See</u> <u>United States</u> v. <u>Simonelli</u>, 237 F.3d 19, 28 (1st Cir. 2001); <u>Awon</u>, 135 F.3d at 101. Other circuits have held differently, <u>see, e.g.</u>, <u>United States</u> v. <u>Mitchell</u>, 502 F.3d 931, 965 n.9 (9th Cir. 2007), but we adhere to our own precedent.

Nonetheless, the district court did not abuse its discretion by refusing to require the Government to present the redacted portions of the December 24 conversation. Jordan contends that fairness required the admission of the redacted portions because they undermined the credibility of Minotti and Ruiz and because the excerpts were unduly fragmented and confusing. Neither of these arguments is well-founded.

First, we address the issue of credibility. As an initial matter, we note that the district court permitted defense counsel to use the redacted statements in cross-examination, and that defense counsel did so effectively. Although timing may be important in some situations, we see no such prejudice here. Moreover, the record is pellucid that defense counsel had abundant opportunity to impeach both Ruiz and Minotti on numerous different

grounds. During the extensive cross-examination, defense counsel was able to reveal the witnesses' myriad (and typically self-serving) inconsistencies and general dishonesty; drug abuse; drug dealing and other lawbreaking; use of foul and offensive language; and the inducement provided by the Government. Frankly, given the record before us, it is hard to imagine that the jury could have found either Ruiz or Minotti to be credible absent the corroboratory evidence supplied by the Government. If the jury credited their testimony at all, it did so with full knowledge that both men were scoundrels motivated by the carrot of reduced sentences (and, in Ruiz's case, revenge). Additional impeachment would have been cumulative. Thus, the district court acted well within its expansive discretion by refusing to require the introduction of the redacted portions of the December 24 conversation pursuant to Rule 106.

Jordan's second contention fares only slightly better. On appeal, Jordan argues that the excerpts of the December 24 conversation are confusing, but he fails to point to specific portions that might suggest prejudicial ambiguity. Having independently reviewed the evidence, we hold that any error was harmless.

We acknowledge that one excerpt might initially have generated some confusion. The redacted transcript reads:

> [Ruiz]: Look, first of all look . . . how did
> . . . the guy know that I was going to go back
> over there because somebody had to tell him.
>
> [Minotti]: You're out of your mind.
>
> . . .
>
> [Ruiz]: I already told Tommy to get me his
> . . . address, if you don't give [it] to me[.]

Exh. 8(c) (second alteration in original). In context, it is clear that Ruiz's first statement refers to his second encounter with Jordan at the Malden Medical Center, when he went back to the scene in search of his cocaine. The second statement by Ruiz, as clarified by the redacted material, refers to Bucci. Without the redacted portions, however, Ruiz's second statement appears to refer to Jordan instead.

Nevertheless, the error was harmless. First, it is difficult to see how the mistaken impression possibly caused by the excerpts might have prejudiced Jordan. The evidence clearly established that Ruiz believed Jordan to be either a counterfeit or corrupt policeman. Second, the <u>Government</u> actually clarified on direct examination that Ruiz was referring to "Gino," not Jordan. Finally, as explained above, Jordan was afforded ample opportunity to correct any possible misapprehensions by extensive cross examination.

### III. CONCLUSION

For the foregoing reasons, we affirm both Bucci's and Jordan's convictions and sentences.

<u>Affirmed</u>.

<u>Affirmed</u>.